**CHICAGO RAWHIDE MANUFACTURING COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 11301.**

United States Court of Appeals, Seventh Circuit.

March 24, 1955.

John H. Bishop, John M. Falasz, Bishop, Burdett, Falasz & Doherty, Chicago, Ill., for petitioner.

Joseph J. Wiedemann, Elgin, Ill., for Intervenor.

David P. Findling, Associate Gen. Counsel, Melvin Pollack, Atty., Marcel Mallet-Prevost, Asst. Gen. Counsel, Norton J. Come, Atty., National Labor Relations Board, Washington, D. C., for respondent.

Before MAJOR, LINDLEY and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

The only question we consider on this appeal is whether or not all the facts viewed together furnish a substantial basis for the National Labor Relations Board's conclusion that the petitioner, Chicago Rawhide Manufacturing Company, was guilty of an unfair labor practice by "supporting, assisting and interfering with various employee associations" in violation of Section 8(a) (2) and (1), 29 U.S.C.A. § 158(a)(2) and(1).

The Company operates several plants throughout the middlewest, manufacturing mechanical, leather and synthetic rubber products. In 1950 a new plant was opened in Elgin, Illinois. For almost a year the employees of the Elgin plant were not approached by a union. During that time the Company set up a system for handling grievances. That system was not satisfactory to the employees, and the Company and a group of employees together worked out a new plan. Among other things this plan called for the creation of a Grievance Committee and an Employees Shop Committee. These two Committees were later merged under the name of Elgin Rawhide Employees Association.

The Company let its employees meet during working hours so that those who had worked out the grievance procedure with management could explain it to the others. Without the Company's knowledge the members of the Shop Committee were elected at these meetings. The employees also organized a Recreation Committee which sponsored baseball teams, arranged picnics, etc. The Company contributed money on several occa-

sions to help defray the expense of activities promoted by that Committee for the employees.

In February of 1951 the International Fur and Leather Workers Union of the United States and Canada, hereinafter referred to as the Union, tried to organize the plant. Petitions were then circulated among the employees asking that the Employees Committee be recognized as their bargaining agent. These petitions were signed by more than 300 employees, about 80 per cent of all the employees in the plant. Both the Union and the Employees Committee demanded recognition as bargaining agent. The Company and the Union petitioned the National Labor Relations Board for an election. The Employees Committee advised that it did not want its name on the ballot. The votes were therefore only on the question of whether or not the employees wanted the Union as their bargaining agent. Pursuant to a "Stipulation for Certification upon Consent Election," an election was conducted by the Board. The Union was defeated 299 to 49. Within a few weeks the employees' petitions were presented to the Company, and the Company recognized the Employees Committee as bargaining agent. The Union thereupon filed a charge with the Board accusing the Company of unfair labor practices in assisting, supporting and interfering with the Employees Committee so as to cause the employees to choose it instead of the Union. The Trial Examiner found the Company not guilty of the violations charged, but the Board reversed him and found the Company guilty.

 The Sections of the Act that the Company is found to be in violation of provide that it shall be an unfair labor practice for the employer to: 8(a)(1)—interfere with, restrain or coerce its employees in their choice of a bargaining representative; and 8(a)(2)—dominate, or interfere with the formation or administration of any labor organization, or contribute financial or other support to it. These two Sections are designed to prevent the employer from having any influence (except by free speech) over unions or the employees' choice thereof. "Support" is proscribed because, as a practical matter, it cannot be separated from influence. A line must be drawn, however, between support and cooperation. Support, even though innocent, can be identified because it constitutes at least some degree of control or influence. Cooperation only assists the employees or their bargaining representative in carrying out their independent intention. If this line between cooperation and support is not recognized, the employer's fear of accusations of domination may defeat the principal purpose of the Act, which is cooperation between management and labor. In this case the Board seems to have confused cooperation by the Company with the employees through the Employees Committees with improper domination, interference and support. We think it clear that the cooperation of the Company did not interfere with, constrain, dominate or contribute illegal support to its employees or the Employees Committees.

In its decision and order the Board concluded:

"We agree with the Trial Examiner that the Respondent did not dominate the formation of the Grievance and Shop Committee. The idea originated with a group of employees, without prior suggestion by the Respondent. However, in the working out of the form and functions of these organizations, there are ample indications of Employer assistance and of potential if not actual control. The Shop Committee was basically an employee representation plan of a type which the Board has often in the past found violative of Section 8(a)(2)."

 Words and actions which might dominate the employees in their choice of a bargaining agent do not constitute domination proscribed by the Act unless the employees are actually dominated. The employer-employee relationship itself offers many possibilities for domination, which is one of the

reasons for the original enactment of the Wagner Act, but *actual domination* must be shown before a violation is established. The Board is quite correct in pointing out that employer assistance may be, and often has been, a means of domination. Assistance or cooperation does not always mean domination, however, and the Board must prove that employer assistance is actually creating company control over the union before it has established a violation of Section 8 (a)(2). "The test of whether an employee organization is employer controlled is not an objective one but rather subjective from the standpoint of the employees." N. L. R. B. v. Sharples Chemicals, Inc., 6 Cir., 209 F.2d 645, 652; N. L. R. B. v. Wemyss, 9 Cir., 212 F.2d 465, 471.

■ All of the acts cited by the Board as unfair labor practices in this case actually show no more than either the Company's cooperation with, or the possibility for control of, the employee association. Neither mere cooperation, preference nor possibility of control constitute unfair labor practices; and the Board may not infer conduct that is violative of the Act from conduct that is not, unless there is a substantial basis, in fact or reason, for that inference. We can find no basis for the Board's step from those non-violative actions which have been proved to the unproved violative conduct which the Board has inferred.

Both the complaint and the Board's final decision and order divide the facts into two groups: conduct that took place more than six months before the charge, and conduct that took place within six months of the charge. Although acts in the former group cannot be found to be unfair labor practices because of the statute of limitations in Section 10(b) of the Act, 29 U.S.C.A. § 160(b), the Board claims that they establish the Company's intent and color those later acts which do fall within the limitation period. Because we do not believe that any of the acts proved constitute substantial evidence (either individually or together) of an unfair labor practice, we shall treat them all alike.

■ According to the Board's conclusion, "Foremost of the indications of support and control is the Respondent's initial immediate willingness to deal with the employees' negotiating committee without inquiry as to its representative status, its acceptance of the temporary Grievance Committee named by the negotiating committee, and the promulgation of the grievance procedure, likewise without questioning or seeking any proof of such status." First let us say that if the Company had recognized the Employees Committees and later the Elgin Rawhide Employees Association without any prior showing of majority representation, that in itself would not constitute an unfair labor practice. The record shows that the Employees Committees with which the Company negotiated did represent a majority of the workers from the very beginning. Although Mr. Agger, the manager of the Elgin plant, did not specifically ask the group of employees that came to him about the grievance procedure whether or not they represented a majority of the workers, the record makes it clear that the Company understood that the Committee did represent a majority. The testimony of Mr. Violi, the representative chosen by the employees, settles any contention that the Company showed preference or tried to interfere with the employees' organization.

"Violi: * * * we know through past experience we have to handle the grievances and everything else, and therefore we don't see why we should pay our money to outside sources and do the work ourselves. We would like to try it out. We don't know whether it would work or wouldn't work, or whether we would be pleased with it or not, but we would like to give it a try, and we would like to know the opinion of the company, how they felt about it. Mr. Agger told me there and then that the company itself or anybody else has nothing to

do or say whatsoever what we are going to have, that it is entirely up to the majority of the employees of the plant, and whatever they want that is what they are going to have."

When the employees first began negotiations with the Company, they did not constitute a labor union. The discussions clearly fell within the proviso of Section 8(a)(2): "* * * an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay." 29 U.S.C.A. § 158(a)(2). At some time during the course of the negotiations over grievance procedure the Employees Committees became a labor union within the meaning of the Act. During this early period it was never questioned that the Grievance Committee and the Shop Committee represented a majority. The membership of both Committees had been elected by the employees and there was no other organization attempting to speak for the employees. The evidence supports no conclusion other than that the Committees actually did represent the majority of employees and that the Company knew this.

■ As soon as the Union entered the picture and requested recognition, the Company withdrew recognition of the two Employees Committees and petitioned the Board for an election. The Company was justified in interpreting the Union's defeat as the Employees Committees' victory. With only the Union and the Employees Committee seeking to be the bargaining agent of the employees the overwhelming defeat of the Union in the election, even though the name of the Employees Committee was not on the ballot, necessarily indicated that the great majority of the employees preferred to be represented by the Employees Committee. The petitions asking for recognition of the Employees Committee, signed by 80 per cent of the employees, which were presented to the Company at this time also furnished additional justification for the Company's again recognizing the Employees Committee. In fact, if the Company had then refused to recognize and bargain with the Association it would have been guilty of an unfair labor practice under Section 8(a)(5) of the Act. Shortly after the election the two Employees Committees became the Elgin Rawhide Employees Association.

All of the cases cited by the Board are easily distinguished from the one before us. In N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368, the Supreme Court found sufficient evidence to support the Board's finding that the company had dominated and supported its employees' bargaining unit and had coerced employees in selecting it instead of the C.I.O. union. The evidence showed that foremen actually solicited for the company union, threatened employees with discharge if they did not "sign up," and even signed the names of some illiterate employees without their consent.

In International Ass'n of Machinists, etc. v. N. L. R. B., 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50, the company "assisted" the union it preferred by openly soliciting for it, and by discharging officials of a competing union. This kind of cooperation is very different from the cooperation which the Rawhide Company gave its Employees Committees.

In N. L. R. B. v. Bradford Dyeing Ass'n, 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed 1226, the Court also found sufficient evidence to support the Board's finding that the company dominated and supported one union while refusing to bargain with a competing union. In that case the record showed that the company had discharged employees for supporting a union it did not favor, supervisory personnel openly solicited for the company union, and the manager repeatedly told employees that the company union was the only one he would recognize.

In N. L. R. B. v. Falk Corp., 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed 396, it was not questioned that the evidence supported the Board's and the court's finding that the company had organized and was

dominating the company independent union.

In Harrison Sheet Steel Co. v. N. L. R. B., 7 Cir., 194 F.2d 407, the company recognized a union which had just *lost* an election, and obviously did not represent a majority of the employees, when there were two other unions trying to organize the plant.

In the instant case the Board also concluded that:

"Other indicia [of domination] are the Respondent's potential control of the Grievance and Shop Committees through the Respondent's unrestricted, although unexercised, power to lay off or transfer the committee members, its assistance to the committees, and interference with their administration, by permitting the elections of the personnel of the committees to be held on company premises and, in the case of the initial elections for shop committeemen, on company time; its supervising of notices of election and permitting their posting on company bulletin boards; its permitting the committees to transact their business on company premises and allowing the processing of grievances in the second step on company time without deduction from the compensation of the committee members; and its contributions to the Recreation Committee which enhanced the prestige of the Employees Committee and constituted indirect assistance to the latter."

These acts do no more than evidence the presence of potential means for interference and support, a possibility that is always present to some degree in an employer-employee relationship. But, without evidence of the realization of that potential, they do not furnish a substantial factual basis for an unfair labor practice finding.

 The acts complained of show only laudable cooperation with the employees' organization, which represented a majority of the employees, rather than interference or support. Allowing the use of Company property, and even time, for employee meetings is not in itself an unfair labor practice. Wayside Press, Inc., v. N. L. R. B., 9 Cir., 206 F.2d 862. The fact that the Company did not know that a few employees were attending meetings on Company time, but did put a stop to the practice as soon as it was discovered, shows that the Company was not intending, by permitting this practice, to coerce or influence the employees' choice of a bargaining representative.

The only financial support extended by the Company was to the Recreation Committee. Both the hearing officer and the Board found that the Recreation Committee was not a labor union as defined by the Act. The Board's only argument is that the Recreation Committee was associated, in the minds of the employees, with the other committees which were unions, and that by helping the Recreation Committee to be more successful in its activities, the Company raised the prestige of the other committees. This is an inference completely unjustified by the facts, which show only the Company's desire to aid its employees' recreational activities. Again this might be a means by which the Company could exert pressure with regard to the bargaining representative selected by the workers, but there is not a scintilla of evidence that it was so used, or was so considered by the employees.

The attitude of the Rawhide employees throughout this controversy is clearly demonstrated by the fact that, through their Association, they have now engaged an attorney who has filed a brief in opposition to the Board's holding. The Company and the great majority of its employees are now, as they always have been, in complete accord as to the bargaining representative. We are not going to permit the destruction of a happy and cooperative employer-employee relationship when there is absolutely no evidence to support a finding of unfair labor practice.

The Board's request for enforcement of its order of June 25, 1953, is denied.

The petition of the Company to set aside the Board's order of June 25, 1953, in which the Company was found guilty of violation of Section 8(a) (1) and (2) of the Act is granted. The Board is ordered to dismiss the complaint.