**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**The ENGLANDER COMPANY, Inc., and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Warehousemen's Local Union No. 117, AFL-CIO, Respondents.**

**No. 15832.**

United States Court of Appeals Ninth Circuit.

Oct. 10, 1958.

As Amended on Denial of Rehearing Jan. 26, 1959.

Jerome D. Fenton, General Counsel,
Thomas J. McDermott, Associate General

Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Fannie M. Boyls, Attorney, N.L.R.B., Washington, D. C., for petitioner.

Walsh & Margolis, Harry Margolis, Seattle, Wash., for respondent Englander Co.

Bassett, Davies & Roberts, Richard P. Donaldson, Seattle, Wash., for respondent International Brotherhood of Teamsters, etc.

Before DENMAN and HAMLIN, Circuit Judges, and BOWEN, District Judge.

HAMLIN, Circuit Judge.

The National Labor Relations Board, hereinafter called the Board, has petitioned this court for the enforcement of its order against Respondent Company, the Englander Company, Inc., its officers, agents, successors and assigns, hereinafter called Englander, and Respondent Union, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Warehousemen's Local Union No. 117, its officers, agents, successors and assigns, hereinafter called Teamsters.

This court has jurisdiction by virtue of Section 10(e) of the National Labor Relations Act as amended, 29 U.S.C.A. § 160(e).

The proceedings before the Board arose generally as follows. Englander had furniture manufacturing plants in Oakland and Los Angeles. Prior to January, 1956, it did not have a plant in Seattle. In December, 1955, John Sparrowk, general manager of Englander's western division with headquarters at Oakland, learned of the possibility of acquiring the plant in Seattle of Craftmaster, Inc., and went to Seattle to investigate. Negotiations for the purchase of the plant began, and culminated some

weeks later on January 16, 1956, with the purchase by Englander of a portion of the Craftmaster inventory and equipment, and the signing of a lease by Englander with the owner of the premises. Englander, however, did not assume any of Craftmaster's contractual obligations.

Craftmaster on January 10, 1956, had terminated the operations of its plant. At the time of its termination and immediately prior thereto, Craftmaster had employed approximately 35 members of the Furniture Workers' Union Local 3197, approximately 71 members of the Upholsterers' Union Local 5, and some truck drivers who were members of the Teamsters' Union (the exact number not being indicated in the record).

Englander had collective bargaining agreements with the Locals of the Teamsters' Union covering its plants in Oakland and Los Angeles; and late in 1955 when Sparrowk was considering the possible acquisition of a plant site in Seattle, he was told by Joseph Dillon, a representative of the Western Conference of Teamsters, that "We expect to have your Seattle operation under contract on the same basis that we have it elsewhere."

Apparently information concerning the possible acquisition of the Craftmaster plant by Englander spread quickly and all three unions—the Furniture Workers' Union, the Upholsterers' Union and the Warehousemen's Local of the Teamsters' Union—began to compete actively with each other to become the bargaining representative.

On January 9th, seven days before Englander acquired the Craftmaster plant, Sparrowk encountered Dillon in Seattle and was introduced by him to Williams, secretary-treasurer of Local 117 of the Warehousemen's Union. Williams then told Sparrowk that inasmuch as "they had contracts with us elsewhere and we had been doing business in Seattle and warehousing and it was handled

by the Teamsters, that they expected to have the representation in whatever undertaking we elected to do here." On January 11, 1956, the Furniture Workers' Union sent a letter to Englander, asking for representation; and on January 12 and 13, pickets from both the Furniture Workers' Union and the Upholsterers' Union appeared and marched in front of the plant. The pickets were withdrawn about February 13th. The plant was not being operated during this period.

On February 14, Englander commenced the operation of the plant with 60 employees. More employees were added on February 15 and 16, bringing the total to 96. Sparrowk testified that he was shown on February 13, 14 and 15 applications for membership in the Teamsters by more than 85 employees, and that on February 15th or 16th, when he returned to the Oakland office, he signed the contract with the Teamsters. The contract had previously been submitted to Englander by the Teamsters, but according to the testimony of Englander's witnesses it had not been signed before then by Englander. This contract contained a security clause requiring employees to become members of the Union not later than 31 days following the beginning of their employment or be discharged by the employer.

The Board found that between January 9, 1956, and February 14, 1956, Englander had violated § 8(a) (2) and (1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1, 2) by entering into a collective bargaining agreement with the Teamsters at a time when the number of employees at work was not representative of Englander's anticipated work force, and by rendering other unlawful assistance to the Teamsters; and violated § 8(a) (3) and (1) by a discriminatory denial of employment to Robert A. McDonald because of his refusal to join the Teamsters. The Board further found that since the Teamsters were unlawfully assisted, Englander and the Teamsters violated the National Labor Relations Act by agreeing to and maintaining a Union security clause in their contract.

A great deal of testimony was presented before the Trial Examiner as to what had occurred during the contacts between the members of each of the three competing unions and the top employees of Englander. As is to be expected, this testimony was in considerable conflict.

■ Section 10(e) of the Act [29 U.S.C.A. § 160(e)] provides that "The findings of the Board with respect to questions of fact *if supported by substantial evidence* on the record considered as a whole shall be conclusive."

The leading case interpreting this Section is Universal Camera v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. The Court considered whether the 2nd Circuit erred in holding that it was barred from reviewing portions of the Trial Examiner's report that had been rejected by the Board. The Supreme Court held that the Court of Appeals was not barred from reviewing these findings of fact. The Court ruled that the *function of the Appellate Court was to* view the evidence *in the light of the record in its entirety* and to set aside the order if not supported by substantial evidence.

## I.

Is There Substantial Evidence of a Contract Having Been Executed by Respondents Prior to February 14?

■ The Board found that Englander and Teamsters entered into a collective bargaining contract "prior to February 14" at a time when the number of employees at work was not representative of Englander's anticipated work force.

In the complaint as it was filed originally by the Board, it was alleged that the contract was entered into on or about January 16, 1956. However, the Trial Examiner found that the contract was

entered into "prior to February 14, 1956" and the Board adopted that finding.

Sparrowk testified that he signed the contract in Oakland on February 15 or 16. The plant had already been opened on February 14th, and it is conceded by all parties that by February 14 or 15 a very large majority of the workers had signed up with the Teamsters. Other than Sparrowk's testimony, there was no testimony by any witness as to when this contract was signed by Englander.

The order of the Board recites the following evidence as a basis for its finding: (1) Sparrowk's testimony of Dillon's statements regarding the Teamsters' expectations of having the representation in the Seattle plant; (2) Sparrowk's testimony of a telephone call from Englander's Chicago office referring to a "contract" signed only by the Teamsters; (3) the lack of any evidence of negotiations between the parties; (4) a purported reference by factory manager Hunt to "an agreement" between Respondents on February 13th; (5) Sparrowk's reference to a "master agreement" in conversation with a Carpenters' Union official on January 26; (6) testimony of Jeanette Testerman that a Teamsters' representative telephoned her on February 10 and said the Teamsters "had a contract here" with Englander; (7) a document signed by applicants for employment at the Teamsters' office that referred to a contract between the Teamsters and Englander.

The first three items above have no evidentiary value at all. (1) Dillon's statements and the (2) lack of evidence of negotiation obviously have no probative value. The circumstances surrounding the (3) telephone call from Chicago are these: Mr. Sparrowk testified that he had a telephone conversation with a Mr. Pink in Chicago who was a vice-president of Englander, and that he was advised by Mr. Pink that the Teamsters had sent a contract to Chicago, signed by the Teamsters, covering the Seattle plant (which was a copy of the one covering

the Los Angeles plant). On February 6th Mr. Pink, in a telephone conversation, told Sparrowk of the receipt of this contract, but told Sparrowk that he did not want him to sign that contract or any other contract until he "was convinced that whatever contract he was interested in signing had a majority of the members." Pink asked where the contract should be sent, and Sparrowk suggested that it be sent to the Oakland office.

Three other items are hearsay and manifest all the untrustworthiness inherent in hearsay evidence.

(4) Factory manager Hunt's alleged reference to an agreement between Respondents was made in the following circumstances: On February 13, one day before the opening of the plant, John Truman, a Carpenters Workers' official, led a group of former Craftmaster employees into the plant. Truman was called into Sparrowk's office and given "a dressing down" by Sparrowk for doing this. It is admitted that at that time Sparrowk told Truman that he, Sparrowk, was doing the hiring and not Mr. Williams. A heated argument followed.

William Evans, a Furniture Workers' representative, testified that he heard loud voices in Sparrowk's office and "went in on "my" own volition" and—

"I said, 'Apparently Mr. Williams is acting as your personnel manager.' [He also testified that the reason he said this was that Williams had called members of his Union and told them to clear through them if they wanted to work at the plant.]

"* * * I believe at that time, although I am not absolutely positive * * * that Mr. Sparrowk left the room to talk to the employees * * * Mr. Hunt said Mr. Williams had the right to call these people inasmuch as the Teamsters held an agreement with the Englander Company." [Tr. pp. 187–189]

Truman corroborated this testimony.

Sparrowk testified that he was in the room until all officials left, and stated that he did. not hear Hunt make any statement concerning Williams' right to do the hiring.

The Trial Examiner took this alleged statement by Hunt to be a binding admission against Englander despite there being no showing of any authority in Hunt in matters involving negotiating with unions. There was, on the other hand, evidence that Hunt, formerly factory manager for Craftmaster, had no supervisory function at this time and was still engaged in winding up the affairs of Craftmaster.

*If* this statement was made, and *if* Hunt had sufficient authority to bind Englander, this offhand remark, made in an atmosphere of dispute and rising tempers, is not of such a nature that this court will hold it to be substantial evidence of a contract having been in existence prior to February 14th.

(5) Truman testified that on January 26 Sparrowk told him that Englander had a "master agreement" with the Teamsters and that he did not want to jeopardize his working relations with the Teamsters.

Truman's later efforts to gain the representation in the Seattle plant belie his taking this reference to a master agreement to mean that a contract between Respondents at the Seattle plant was already in existence. We hold it to be more reasonable to believe that Sparrowk was referring to the Englander contracts with the Teamsters at its California plants.

(6) Testimony of Jeanette Testerman that on February 10th Bombadier, a representative of the Teamsters, telephoned her and asked her to go to work. She said that Bombadier told her "they had a contract here" (meaning the Seattle plant).

The Trial Examiner said of Miss Testerman's testimony on another point that she had a "tendency to place an interpretation on things she heard Sparrowk say which differs somewhat from the actual content of what was said." The Examiner also ruled that the subject telephone conversation was hearsay as to Englander and inadmissible against the employer. Despite this, the Board recites it as a basis for holding that there was a contract in existence prior to February 14.

■ The rule is settled that hearsay is not substantial evidence, Consolidated Edison Co. of New York v. N. L. R. B., 1938, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; N. L. R. B. v. Haddock-Engineers, 9 Cir., 1954, 215 F.2d 734. Notwithstanding its possible admissibility against the Union, we hold that this evidence is not the "kind * * * responsible persons are accustomed to rely [on] in serious affairs." N. L. R. B. v. Service Wood Heel Co., 1 Cir., 1941, 124 F.2d 470, 473.

(7) On February 6th applicants for employment signed a document at the Teamsters' office which contained a recital that the signatories would abide by all working conditions contained in the contract between Englander and the Teamsters.

This, too, is hearsay and held by the Trial Examiner to be inadmissible against Englander. Quite apart from its admissibility, the document is entitled to little weight. It appears to be the method used by the Union to bind its prospective members if and when the Union gained the representation at the Seattle plant.

During this period, it must be remembered that from about January 11 to February 13, the Englander plant had been picketed by two unions and the third union was also demanding the right to represent the workers.

Various references had been attributed to Teamster officials and Englander officials as to an alleged "master agreement," an alleged agreement of "nation-

al scope," and to the effect that the alleged "master agreement" covered the Seattle plant which was being acquired by Englander. Actually there was no "master agreement" or agreement of "national scope." There were only the agreements covering the Oakland and Los Angeles plants. This distortion of the admitted facts undoubtedly led to misconceptions as to whether the "contract" mentioned by witnesses was a contract between Englander and Teamsters at either its Oakland or Los Angeles plants, or a contract between Englander and Teamsters covering its newly acquired Seattle plant.

It would hardly seem that during this period it would be the part of common sense for Englander to sign a contract with any one of the three unions which clearly did not have a majority of the workers. Sparrowk testified that he was ready to enter into a labor agreement with an organization that had a majority of the people in the plant, and that when on February 13th he was advised by the Teamsters' representative that they thought that they had a majority of the employees that he went immediately to examine the applications that had been signed. He counted the number of those applications, made note of the fact that they showed that they had been formerly employed by Craftmaster, and found that there were in excess of 60 names. The next day, February 14, he was shown a list with additional names of those who had signed applications to join the Teamsters' Union. This number was in excess of 20. On the morning of February 15, prior to Sparrowk's taking a plane for Oakland, he was shown some additional names which had been signed up by the Teamsters. Thereafter, when he returned to Oakland on either the afternoon of the 15th or the morning of the 16th of February, Sparrowk examined the contract in the Oakland office which had been received from Mr. Pink, found that in its main particulars it was similar to the contract already in existence covering the Oakland and Los Angeles plants, looked at the typewritten portion thereof which covered the Seattle plant, and signed it.

The Board found, against some opposing testimony, that Sparrowk had told the truth in other particulars. To find against him on his positive testimony that the contract was signed on February 15th or 16th *and not before,* is to brand him as a deliberate perjuror on that point. This they do, not by relying on any direct or positive testimony but by drawing unfavorable inferences from weak, ambiguous statements by persons admittedly having an adverse interest.

The Board's finding that a contract at the Seattle plant existed "before February 14th" is not based on any solid testimony. No witness testified to ever having seen such a signed contract or that such a signed contract was in existence.

This whole case must be viewed in the light of common sense. There was a three-cornered union jurisdictional dispute, each of the three unions vying for the right to represent the employees of a new company.

Englander was not new to labor contracts. In view of the particular unions involved, reason would persuade it to act slowly. It must be credited with knowing that to make a contract with a union that did not represent a majority was only inviting further trouble.

Its testimony that under the circumstances it wanted to find which union represented a majority of the employees (which was also the advice its vice-president in Chicago gave to Mr. Sparrowk) before signing a contract is highly persuasive and is based on substantial evidence. We find that upon an examination of the whole record there is no substantial evidence to support the conclusion of the Board that the contract was entered into before February 14th.

## II.

### Did the Referrals of Applicants to the Teamsters Union Constitute an Unfair Labor Practice?

■ The Board found that the referrals of applicants to the Teamsters' Local violated 29 U.S.C.A. § 158(a) (2) and (1) which reads as follows:

"158(a). It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees of the exercise of the rights guaranteed in § 157 of this title;

"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; * * *."

On January 11, prior to the acquisition of the Craftmaster plant by Englander and while an inventory was being taken by Craftmaster, Mr. Sparrowk, vice-president of Englander, was at the then closed Craftmaster plant and interviewed fifteen or twenty former Craftmaster employees who had come to the plant seeking employment with Englander. Some of these persons testified in the hearing before the Board.

It is the contention of the Board that the actions of Sparrowk in these conversations and the action of a foreman Moore on another occasion violated the above sections of the National Labor Relations Act.

Three witnesses—Testerman, Bale and Granger—testified that Sparrowk in these conversations said respectively to them that they would have to "clear through the Teamsters," "join the Teamsters if he wanted work," and "would have to clear through the Teamsters before he could go to work"; and that Sparrowk gave to each of them the address of the Teamsters.

Sparrowk admitted that he gave the address of the Teamsters to them, but testified that it was under the following circumstances. He said he told them that he had been informed by the Teamsters that they expected to represent the employees in this plant and that he was passing on this information. He said that in giving the address he "told them to acquaint themselves with the facts— that they could get facts from Mr. Williams of the Teamsters' Local No. 117," and "to go and get the information as to what they could do for them." He testified that he also said, "We didn't want any problem with anybody's Union, that whoever could show us they had the majority of the people represented by their Union would be the people that we would do business with."

He flatly denied that he told any of them "to clear through the Teamsters," or that they should join the Teamsters if they wanted work, or that they would have to clear through the Teamsters before they could go to work.

The Trial Examiner, in considering this evidence, says in his findings that the weight of the evidence *will not support a finding* that Sparrowk told any job applicant that he would have to "clear through" the Teamsters, or that clearance by or membership in the Teamsters was a condition of employment. He further indicates that he cannot believe the testimony of Testerman, Bale or Granger in these respects. Yet, in reference to the remainder of the statements claimed by Sparrowk to have been made by him, he states that the expression of neutrality by Sparrowk is open to substantial doubt by reason of the fact that "Englander and Teamsters entered into their contract at a time when they had no lawful right to do so." As we have indicated above, this Court has found that on the whole record there was no substantial evidence to support the finding that the contract was entered into unlawfully. Yet, the Trial Examiner relies heavily on the alleged unlawful contract to conclude that Sparrowk's references to the Teamsters was unlawful assistance. The Trial Examiner further

states that the evidence will not support a finding that Sparrowk said the employees would have to clear through the Teamsters, yet he states that "it would be only natural for the job applicants * * * to construe Sparrowk's ungermane and unsolicited proposal that they go to the Teamsters' Local to discuss applications for membership in that organization as meaning that Englander preferred the Teamsters' Local over the other unions, and that clearance by or membership in the Teamsters' Local was to be a condition of employment at the plant." Note, this required two inferences by the Board: (1) that Sparrowk intended the applicants to understand this; and (2) that they did so understand it.

As far as actual assistance is concerned, the evidence shows that only one employee—Walters, a man of the age of 74 years—actually joined the Teamsters shortly after his conversation with Sparrowk. The rest of the employees did not sign up with the Teamsters until almost a month later, on or about February 13th, at which time an agreement had apparently been reached between the Upholsterers' Union, the Furniture Workers' Union and the Teamsters' Union whereby all of the employees signed up with the Teamsters' Union.

One other instance is relied upon by the Board to prove a violation of § 158(a) (2) and (1). One Josephine Griffin testified she went to the plant on February 14 to apply for work. She was referred to William J. Moore, the former employee of Craftmaster who was then a foreman for Englander. She testified she handed him her application blank and that "He said, 'We have a job for you, we have a dowling machine, and you could start work tomorrow morning, but first you have to get it straightened out with the Teamsters,' and I said 'Do you mean it isn't settled yet, it is not going to be the Furniture Workers?' He said,

'Well, it isn't settled yet one way or the other.' Then I don't know just what else was said, but I said, 'You mean I've got a job if I join the Teamsters?' And he said, 'Yes.'"

She testified she then went to see Mr. Kissick, an official of the Furniture Workers' Union, told him what had happened, and he said, "Go ahead and join the Teamsters," which she did that day.

She further testified on cross-examination that Moore told her that the controversy had not been settled one way or the other and that she decided to join the Teamsters only after she had spoken to Mr. Kissick.

The mere statement of the testimony indicates its flimsy and contradictory character.

Moore denied that he had told any employee or any prospective employee that he had to join the Teamsters' Union. As a further indication of what little weight this testimony should be given, it will be remembered that on February 14th the testimony showed that the Teamsters already had a majority of the employees of the plant signed up.

The Board contends that § § 8(a) (2) and (1) of the Act requires that the employer refrain from all interference and remain strictly neutral. It cites this court's opinion in N. L. R. B. v. L Ronney & Sons Mfg. Co., 9 Cir., 1953, 206 F.2d 730, 733. There, the employer was negotiating with two unions at once, and in addressing his employees called the CIO a "bunch of Communists and crooks," and discharged workers of the disfavored union prior to a consent election. Other cases have held that using company time and presses to print ballots for an allegedly favored union prior to an election did not violate the Act, Wayside Press v. N. L. R. B., 9 Cir., 1953, 206 F.2d 862; and that neither cooperation, preference, nor possibility of control constitutes an unfair labor practice,

Chicago Rawhide Mfg. Co. v. N. L. R. B., 7 Cir., 1955, 221 F.2d 165.[1]

Neither actual domination or coercion has been shown in this case, nor was there substantial evidence to warrant a finding that the workers could reasonably believe the statements attributed to management were of a coercive nature. N. L. R. B. v. Corning Glass, 1 Cir., 1953, 204 F.2d 422, and Coppus Engineering Corp. v. N. L. R. B., 1 Cir., 1957, 240 F.2d 564, hold that the First Amendment guarantees the employer his right to express his preference in a labor dispute. This showing of preference is lawful so long as it falls short of restraint or economic coercion.

We do not believe that the testimony concerning the referrals by Mr. Sparrowk or the alleged conversation of Griffin with Moore is sufficiently substantial to prove that Englander was guilty of the unfair labor practice which is denounced by § 158(a) (1) or (2).

### III.

### Was Englander Guilty of Discriminatory Action Against McDonald?

The only other claim of the Board that Englander was guilty of an unfair labor practice was its alleged discriminatory action against one Robert McDonald.

The testimony of McDonald was that on February 20th he went to the plant and made out an application to one Red Henry, the head shipping clerk (who was not shown to have had any hiring duties). Henry said there was no job available, but that night Henry called McDonald on the phone at his home, told him there was a job available, "but he mentioned I would have to clear through the Teamsters." A few days later McDonald went to the plant and saw Moore. Mc-

Donald then testified as follows: [Tr. p. 258]

"A. He told me what my job would be, it would be packing mattresses and putting covers on box springs, which I would be familiar with. He told me I would have to join the Teamsters and I flatly refused. I says, 'Why join the Teamsters when the Carpenters & Joiners have the furniture plants?'
\* \* \*

"Q. (By Mr. Boyd) What more was said by him or by you? A. He said, 'Let's put it another way.' He said, 'why should you be the only one not to join the Teamsters when everybody else has?' I told him again I refuse to join the Teamsters. He says, 'Well, I guess we can't do any business, that will be about it.'

"Q. Was that the end of your conversation? A. Yes, it was."

The union agreement which had been *theretofore* on February 15th or 16th entered into between Englander and the Teamsters contained a security clause which required all employees to join the Union after 31 days employment. Taking this conversation at its face value (although denied by Moore), the conversation could just as reasonably have referred to the requirement of the security clause to join the Teamsters *after* 31 days employment as the construction placed on it by the Board that it required joining the Teamsters *before* the employment. If it had the former construction, it was of course perfectly legitimate under the security clause.

As we find that there was no contract in existence prior to February 14th and that when the contract was signed the Teamsters represented a majority of the workers, we hold that the union security

---

1. Where the Court said at page 167, of 221 F.2d:
"A line must be drawn, however, between support and cooperation. Support, even though innocent, can be identified because it constitutes at least some degree of control or influence. Cooperation only assists the employees or their bar-

gaining representative in carrying out their independent intention. *If this line between cooperation and support is not recognized, the employer's fear of accusations of domination may defeat the principal purpose of the Act, which is cooperation between management and labor.*" [Emphasis supplied.]

clause is valid and that McDonald was not the victim of unlawful discrimination.

 As was stated in N. L. R. B. v. Sunset Minerals, Inc., 9 Cir., 1954, 211 F. 2d 224, 226: "We recognize the power of the Board to draw 'reasonable inferences' from the evidential facts found at the hearing." However, as the Court found in the Sunset Minerals case, we here hold that the inference drawn by the Board concerning the McDonald matter, considering the time of the conversation, all of its surrounding circumstances, the nature of it, and its denial by Moore, is not reasonable and does not constitute substantial evidence on the whole record to support the Board's finding. The Court, therefore, is not required to follow it; N. L. R. B. v. Sunset Minerals, Inc., supra; Coppus Engineering Corp. v. N. L. R. B., supra; N. L. R. B. v. Houston Chronicle Pub. Co., 5 Cir., 1954, 211 F.2d 848; N. L. R. B. v. Coats & Clark, Inc., 5 Cir., 1956, 231 F.2d 567; N. L. R. B. v. Fox Mfg. Co., 5 Cir., 1956, 238 F.2d 211; N. L. R. B. v. McGahey, 5 Cir., 1956, 233 F.2d 406; N. L. R. B. v. National Paper Co., 5 Cir., 1954, 216 F. 2d 859; N. L. R. B. v. Huber & Huber Motor Exp., 5 Cir., 1955, 223 F.2d 748; N. L. R. B. v. General Drivers, etc., 5 Cir., 1955, 225 F.2d 205.

"An unlawful purpose is not lightly to be inferred," N. L. R. B. v. McGahey, supra [233 F.2d 413].

The power of the court to disregard the Board's inferences where unreasonable and without substantial support in the evidence is not only applicable to the McDonald incident but is equally applicable to the Board's findings as to the time of the execution of the contract and the referrals by Englander.

We have carefully examined the whole record and hold that there is not substantial evidence upon the whole record to support the Board's order.

The petition for enforcement is denied.