**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**The POST PUBLISHING COMPANY, Respondent.**

**No. 13780.**

United States Court of Appeals Seventh Circuit.

Dec. 21, 1962.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Attorney, N. L. R. B., Washington, D. C., Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Allison W. Brown, Jr., Attorney, N. L. R. B., MacDonald Gallion, Atty. Gen. of Alabama, John C. Tyson, III, Asst. Atty. Gen., for petitioner.

Victor M. Harding, Milwaukee, Wis., Whyte, Hirschboeck, Minahan, Harding & Harland, Milwaukee, Wis., for respondent.

Before HASTINGS, Chief Judge, and KNOCH and CASTLE, Circuit Judges.

HASTINGS, Chief Judge.

This case is before us on the petition of National Labor Relations Board for enforcement of its order issued against respondent, The Post Publishing Company, on March 15, 1962. The order in question was entered pursuant to Section 10 of the National Labor Relations Act, as amended, 61 Stat. 136, 73 Stat. 519, 29 U.S.C.A. §§ 151–168, herein called the Act. The Board's decision and order are reported at 136 NLRB No. 23.

The Board found, in agreement with the Trial Examiner, that respondent violated § 8(a) (2) and (1) of the Act [1] by offering and contributing financial and other assistance and support of the Appleton Post-Crescent Craftsmen's Union, herein called PCCU.

At the time of the dispute in question, PCCU was an independent union and since 1921 had been the lawfully recognized bargaining agent and representative of respondent's mechanical employees.

The charging party in this case is Appleton, Neenah & Menasha Typographical Union No. 612, International Typographical Union, AFL-CIO, herein called ITU. It was seeking to replace PCCU as the bargaining representative of respondent's mechanical employees. Thus, it appears at the outset that respondent found itself in the middle of a representation dispute between the two unions.

Respondent is a Wisconsin corporation engaged in the business of newspaper publication and printing in Appleton, Wisconsin. It employs about 175 persons, including approximately 70 employees in its composing room.

Prior to 1921, composing room employees were represented by ITU under a closed shop contract. In that year, such

employees voluntarily left the ITU and formed PCCU as an independent labor organization. Since that time PCCU has negotiated and executed successive collective bargaining agreements with respondent.

There is no claim that respondent was the motivating force in the 1921 break with ITU. There is no claim by the Board that respondent has ever dominated or interfered with the internal affairs of PCCU. The trial examiner paid tribute to the character of the relationship between respondent and PCCU in the following language:

"The PCCU has been an active labor organization for about 38 years, during which it negotiated and signed yearly contracts with Respondent, and discussed and adjusted grievances with it, operated under a formal constitution and bylaws, elected officers periodically, and conducted private meetings with some adherence to parliamentary procedure. * * * In this long period no criticism or even suspicion has been cast upon its legitimacy or independent character, or Respondent's relation to it, so far as this record discloses, until the filing of the charge herein. It is significant that Respondent is not charged with domination of the PCCU * * *. [T]he parties have enjoyed amicable relations over the years, with no strikes or work stoppages by the employees, and amicable adjustment of all grievances between the parties themselves without resort to outside arbitration."

It is agreed that the employees broke away from ITU and formed PCCU because they thought ITU dues and other charges were too high. At the time of the hearing, ITU charged initiation fees of $75 and dues of $23 a month. By way

---

1. 29 U.S.C.A. § 158(a) which provides:
"It shall be an unfair labor practice for an employer—
"(1) to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it * * *."

of contrast, in the beginning PCCU assessed dues of not to exceed 50¢ per month and initiation fees of $2.50 to $5.00. About 1948, PCCU eliminated all dues because of a surplus in its treasury.

It was several years after PCCU had discontinued the collection of dues before respondent began what the Board found to be "financial support" of PCCU.

Respondent installed a cafeteria for employees on its premises in 1952. The mechanical employees requested respondent to permit them to operate it. Respondent agreed and appointed Amil Hofmann, a PCCU member as cafeteria director. Hofmann operated it until 1961 when he retired and was succeeded in that capacity by another employee. The trial examiner found that:

"In this period, he bought the food, fixed and changed food prices, handled its accounts and kept the profits in a separate bank account. Respondent exercised no control or supervision over his operation of the cafeteria, and paid him nothing for it; his sole compensation for that work was 10 percent of the profits, which he received by arrangement with the PCCU. Shortly after he became manager, Respondent told Hofmann the PCCU could take the cafeterial profits, and since that time those profits, amounting to about $600 per year, have been used by him mainly to defray the costs of refreshment served at PCCU meetings and at its annual Christmas parties. In addition, cafeteria personnel have used its food stocks to serve refreshments at some PCCU meetings. The PCCU never charged its members or used its own funds for these items, or reimbursed the cafeteria fund therefor. Since Hofmann's retirement another employee has in like manner continued to manage the cafeteria and disburse its funds for the benefit of the PCCU."

Prior to 1959, respondent had an unsatisfactory experience with coffee vending machines for employees on its premises. During 1959, at their request, the mechanical employees were given permission to arrange for the installation of a coffee vending machine of the type they wanted. Such a machine was installed and PCCU was permitted to retain respondent's share of the profits therefrom for its union purposes. These payments have averaged about $10 per month.

Thus, it appears that PCCU has realized about $600 per year from cafeteria profits and $120 per year from the coffee vending machine profits, or total annual receipts of $720. It is undisputed that PCCU used these funds over the years to pay the expense of an annual Christmas party for mechanical employees and their wives, to purchase refreshments served at PCCU meetings, to buy occasional gifts for members who were ill, to pay for a standard $10 wedding present and to purchase flowers at the death of members. In 1961, PCCU paid its attorney $100 for legal services in preparation and filing necessary reports in compliance with the reporting provisions of the 1959 amendments to the Act.

As will subsequently appear, it was from the receipt of these funds by PCCU that the Board found "that respondent offered and contributed assistance to the PCCU, in violation of Section 8(a) (2) and (1) of the Act."

On April 4, 1961, ITU held an organizational meeting for employees in Appleton which was attended by some mechanical employees of respondent.

Two days later, at respondent's request, PCCU held a meeting of its members in the plant cafeteria after work. At this meeting, respondent's president Minahan told the employees that the management had learned there were grievances which had caused some employees to try to bring ITU into the plant. He expressed surprise since no grievances had been filed and inquired about any complaints they might have.

The trial examiner found that Minahan "told the men that the Company was not trying to interfere with those who wanted to join the ITU, or any other organization, as they had a right to join any union they desired, and the Company

would bargain with any union they chose." He said he did not care if they joined ITU, but preferred to deal with PCCU because of 38 years of amicable relations with that organization. Employees then voiced various grievances.

Something was said at this meeting about the need of an attorney to represent PCCU in bargaining with respondent. There is a sharp conflict in the evidence concerning whether Minahan said that respondent would hire such an attorney for PCCU. The trial examiner noted this conflict and credited Board witnesses and inferred therefrom "that Minahan seized upon the employees' mention of the need for an attorney to throw out the suggestion that Respondent could help the PCCU with funds for this purpose, in an attempt to forestall any move by the employees to change their bargaining representative."

This incident is important only in the sense that the trial examiner used it as the basis for finding that respondent thereby "proffered further financial assistance and support to the PCCU," in violation of the Act.

It should be noted here that shortly thereafter PCCU hired its own attorney and paid him for his services out of PCCU funds. If such an offer could be inferred from this incident, it was never accepted or acted upon.

Subsequently, following an exchange of correspondence between respondent and ITU, the latter demanded recognition as the representative of a majority of the mechanical employees. Respondent refused such recognition because of its current contract with PCCU.

This was followed by an interunion struggle between ITU and PCCU for control, and PCCU apparently won out. In any event, ITU has never petitioned for a Board-conducted election.

Subsequently, ITU filed the charges resulting in this action. It charged respondent with the following alleged violations: (1) entering into a contract with PCCU which favored union members over non-members; (2) giving PCCU illegal support by allowing it to use respondent's cafeteria for union meetings; (3) giving PCCU illegal support by permitting it to print its union notices on respondent's machines; and (4) furnishing PCCU illegal support by permitting it to retain the profits from the operation of the cafeteria and coffee vending machine.

The trial examiner found no merit in the first of these charges and dismissed it. He found that the conduct complained of in the second and third charges, standing alone, would not constitute a type of "support" that amounted to a violation of the Act.

However, on the fourth charge, he ruled that the receipt of profits from the operation of the cafeteria and coffee vending machine was violative of the Act. He then considered the conduct alleged in charges 2 and 3 as contributing to such violation as a part of an overall pattern of continued and substantial support of PCCU "which was well calculated to coerce and restrain employees in the exercise of their right freely to choose or change their bargaining representative."

The Board approved and adopted the trial examiner's report without change and entered an appropriate order thereon.

The trial examiner agreed there was no evidence showing that respondent had made use of this "support" to gain concessions from PCCU in bargaining and that respondent had not threatened to discontinue such "support" if the employees left PCCU and joined ITU.

The narrow issue before us is whether the granting of annual financial benefits of $720 to PCCU, in the context of its 38-year history of amicable relationship with this independent union, constituted illegal financial support by respondent in violation of the Act.

At the outset, the resolution of this issue must be made in the light of the Board's concession that *there is no claim that respondent was the motivating factor in the organization of PCCU and*

that *no claim is made that respondent dominated this independent union.*

We conclude that the Board erred in failing to properly distinguish between "support" and "cooperation." The findings of proscribed support under the Act are unsupported by substantial evidence in the record considered as a whole and are contrary to law.

The course of conduct engaged in by respondent in its relationship with PCCU follows that pattern of friendly and courteous cooperation, or even generous action, of the sort we feel brings about the end result in labor-management relations sought by the underlying philosophy motivating the National Labor Relations Act.

This course of conduct flows directly from union requests. Absent any showing of employer domination, we fail to find in the record that showing of proscribed motivation warranting an inference drawn by the Board that it was calculated to unlawfully coerce or restrain the employees in their right to freely choose or change their bargaining representative.

The fact that the union members chose to eliminate dues and forego the provision for many fringe benefits to its members was a decision it made. Respondent did not participate in any way in the decision of the union as to how it would derive its income, or in what manner it would incur expenses in the conduct of its business. All that respondent did was to assist the employees in carrying out their independent activities. No one ever complained until a representation dispute was precipitated. That complaint was made by the dominant international organization in its effort to oust the small independent group.

This court first gave expression of approval of this form of "cooperation," as distinguished from "support," in Chicago Rawhide Mfg. Co. v. National Labor Relations Board, 7 Cir., 221 F.2d 165 (1955). This case has been followed and cited with approval many times and need not be reviewed again here. Fur-

ther, one or another of these cases directly pass upon the various elements of conduct involved in the instant appeal. See Kimbrell v. N. L. R. B., 4 Cir., 290 F.2d 799, 802 (1961); Hotpoint Co. v. N. L. R. B., 7 Cir., 289 F.2d 683, 688–689 (1961); N. L. R. B. v. News Syndicate Company, Inc., 2 Cir., 279 F.2d 323, 330 (1960), aff'd, 365 U.S. 695, 81 S.Ct. 849, 6 L.Ed.2d 29; National Labor Relations Board v. Englander Company, 9 Cir., 260 F.2d 67, 75–76 (1958); Coppus Engineering Corp. v. National Labor Relations Board, 1 Cir., 240 F.2d 564, 571–573 (1957). The Board cited Rawhide with approval in Detroit Plastic Products Company, 114 NLRB 1014, 1023–1026 (1955).

We have carefully reviewed the many cases cited by the Board. In practically all of them, the facts clearly demonstrate antiunion bias by the employer, financial support combined with union domination by the employer, discriminatory discharges, threats or other unfair labor practices interwoven with acts of alleged illegal financial support. Such is not the case here.

We hold, absent any showing of employer motivation in the original organization of the independent union or any showing of subsequent employer domination thereof, that a course of conduct over a period of years by an employer in its amicable relationship for 38 years with an independent union acting as a bargaining agent for employees (1) in permitting the union to hold meetings in its cafeteria (after working hours), (2) in permitting the union to print notices on the employer's duplicating machines, (3) and in permitting the union to retain annual profits of about $600 from the operation by the union of employer's cafeteria for employees and about $120 annually from the operation of a coffee vending machine for employees on its premises by the Union, all at the instance and request of the union and under the circumstances as herein earlier set out, is a permissible form of friendly cooperation designed to foster and resulting in uninterrupted harmonious la-

bor-management relations, and is not the form of "support" designed to interfere with, restrain or coerce employees in the free exercise of their right to choose or change their bargaining representative.

For the foregoing reasons, we deny the Board's petition for enforcement of its order against respondent.

Enforcement denied.