## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## MAGIC SLACKS, INC., Respondent.

### No. 13796.

United States Court of Appeals
Seventh Circuit.
March 12, 1963.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Atty., Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Allen M. Hutter, N. L. R. B., for petitioner.

Harry H. Ruskin, Chicago, Ill., Gilbert A. Siegel, Chicago, Ill., of counsel, for respondent.

Before SCHNACKENBERG, KNOCH and SWYGERT, Circuit Judges.

KNOCH, Circuit Judge.

This matter comes before us on the petition of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, as amended, (Title 29 U.S.C. § 151 et seq.) for enforcement of its Order, as amended, against respondent, Magic Slacks, Inc. The Board's Decision and Order are reported at 136 NLRB No. 56.

The charging party was the International Ladies' Garment Workers Union, A. F. of L.-C. I. O. (hereinafter called the "Union"). The proceedings were initiated by the Union's charge that two employees had been discriminately laid-off by respondent. A complaint issued alleging that respondent interfered with employees' rights and discriminately laid off one employee in violation of Section 8(a) (3) and (1) of the Act. Respondent filed its answer and hearing was set for August 22, 1961.

After the hearing had begun, without prior notice, and over objection of respondent, the Board's counsel introduced new charges, orally read complaints into the record, and put on evidence concerning alleged domination, sponsorship, and support of an Employees' Committee (hereinafter called the "Committee") and also charged interfering conduct against James F. Fonte, Jr., respondent's employee, in violation of Sections 8(a) (2) and (1) of the Act, respectively. An amended complaint covering these new charges issued after the Board's evidence had been introduced.

In his intermediate report, the Trial Examiner recommended dismissal of all allegations contained in the original Union charges. With some modification respecting the discharged employee, the Board adopted his findings of fact and conclusions of law. The Trial Examiner found no evidence that the discharged employee's union activity was known to respondent. The General Counsel's exception to this finding was based on the small number of employees, all working in one room in view of their supervisor and the fact that there had been open discussion of the Union. Under these circumstances, he reasoned that knowledge was fairly inferable. The Board, however, declined to decide that issue or to pass on the Trial Examiner's finding because the Board found a failure to establish discriminatory rather than economic reasons for the discharge.

The Trial Examiner also found (and the Board adopted his findings and conclusions) that respondent violated Sections 8(a) (2) and (1) of the Act by dominating, sponsoring and assisting the formation and administration of an Employees' Committee, by conducting a poll of employees, and by promising economic benefits, to induce abandonment of the Union. He found the remaining allegations of the complaint not to be established by a preponderance of the evidence.

The Board held that (1) respondent was not prejudiced by issuance of the amended complaint incorporating the new charges without prior notice, and (2) the new charges were not rendered invalid as initiated by the Board rather than the Union.

■ We are of the opinion that denial of respondent's request for a continuance and opportunity to prepare respondent's case on the new (and distinctly different) charges resulted in denying respondent a fair and adequate hearing. However, we do not reach that and other issues raised in the briefs and argument, as will more fully appear below.

The evidence may be briefly summarized as follows: James Fonte, Jr., respondent's employee, called as a witness by the General Counsel, testified that in 1957 or 1958 there had been rumors of a union and "the people said: we don't want any union; we want to see if we can work things out with just the committee, and that is how this committee was formed." He testified further that the Employee's Committee consisted of himself, and five other employees (all women). Although the Committee had no chairman, Mr. Fonte, with and without other members of the Committee in attendance, had on occasion discussed with Earl Katz, respondent's plant man-

ager, such matters as vacation pay, paid holidays, and individual specific work practices.

The Board asserts that the Committee became inactive, relying on Mr. Fonte's statement that the last meeting between Mr. Katz and the whole Committee was in 1959. Mr. Fonte also testified that there was no grievance committee, that when questions arose regarding operations they were brought to his attention, and he would take them up with Mr. Katz. He referred to one such matter as having occurred in the past year. Similarly, Mr. Katz testified to a discussion with Mr. Fonte about vacation pay in January 1960, as a result of which vacation pay was paid at vacation time in 1960 instead of at Christmas time, as formerly. In January 1961, there was another discussion between Mr. Katz and Mr. Fonte relative to paid holidays.

Mr. Fonte testified further that in May 1961, he had called a Committee meeting, at which he was elected chairman, and at which various demands were raised, which Mr. Fonte presented to Mr. Katz. Mr. Katz had rejected a demand concerning inclusion of piece rates with hourly rate increases because of the difference in the set-up of piece work. A demand for a designated first aid attendant was promptly granted. Mr. Katz agreed to take up the other demands with Sidney Baum, respondent's president. It was agreed that an extra fan would be installed, and two additional paid holidays were ulitmately granted.

After this discussion between Mr. Fonte and Mr. Katz early in May 1961, the Union filed its charges on May 15, 1961, with reference to the lay-off of two employees on or about April 13 and April 16, 1961.

Just before Memorial Day, 1961, respondent's president spoke to the employees, read provisions of the National Labor Relations Act relating to the right of self-organization, and stated that the company was neutral on the question of a union.

The Committee meetings all took place in the employees' lunch area located in the front of the plant, which comprised one large room with different operations occurring in different parts of the room. There was no evidence to controvert the testimony of Mr. Katz that no supervisor or other management personnel ever was a member of the Committee, took part in its administration, selection of its members, or other Committee procedures. The testimony indicated that Committee meetings occurred during "break" time and were held without seeking permission of respondent; that in the absence of interference with production Committee meetings were allowed to run beyond "break" time, without loss of compensation to Committee members.

The Board stresses the fact that the one-room set-up made all meetings in the lunch area visible to Mr. Katz whose work carried him to the different parts of the plant, but it is nowhere suggested that he heard the proceedings.

In March 1961, Union representatives asked Mr. Fonte to arrange to have other employees of respondent meet with them. Literature was distributed at the door of the plant. Two or three meetings were held with the employees in March 1961. The third meeting may have been held in April 1961.

Although he passed out Union cards between the first and third meetings, Mr. Fonte changed his mind about the Union after the third meeting and so informed Mr. Katz. He testified that at the time of the first Union meeting, Mr. Katz had said that it was all right for the Union to pass out leaflets and that it was up to the employees whether they wished to attend the meeting.

The Union at no time demanded recognition. Respondent had no anti-union history. None of the statements attributed to respondent are of a coercive nature. The Board relies heavily on a conversation between Mr. Fonte and Mr. Katz in which the latter asked why Mr. Fonte had not come to him with his Committee instead of seeking outside help.

Mr. Fonte placed this conversation as occurring prior to the May meeting of the Committee, but apparently after he had told Mr. Katz of his change of heart respecting the Union. Mr. Katz testified that a conversation to that effect took place when Mr. Fonte came to him with the demands drawn up at the May Committee meeting. The Board accepts Mr. Fonte's recollection of the date and infers therefrom an effort by Mr. Katz to revitalize the Committee, which Mr. Katz testified he always considered to be in continued existence. As indicated, the evidence does not support a finding that the Committee had become inactive. Mr. Fonte, himself, testified that calling the May meeting was his own idea. The conversation, in any event occurred after the Union ceased its organizing efforts.

A few days after submitting the demands to Mr. Katz, Mr. Fonte asked him for news and was told of rumors that the Committee did not have the support of the employees in general. Mr. Katz declined to approach President Baum with the Committee's demands unless he had the "confidence" of the employees. Mr. Fonte testified that when he said that "the only thing to do was to ask," Mr. Katz had said it was up to Mr. Fonte. The latter then presented the problem to the other employees at the next "break." One of the employees suggested a ballot box and a written vote was taken. The time consumed by the vote ran to 20 or 30 minutes beyond "break" time for those collecting and counting the ballots. The result was a vote of confidence 47 to 3. Mr. Katz was told of the result of the poll and a week later he announced that two additional paid holidays would be granted. One of these holidays was to have been Memorial Day. Mr. Fonte testified that the employees were not paid for Memorial Day, 1961, because the Union had filed its charges by then. He testified that President Baum told him that respondent would not be allowed to give new benefits pending the National Labor Relations Board proceedings. Mr. Fonte had then suggested the meeting of the employees, mentioned above, which Mr. Fonte assembled and at which President Baum explained the situation. When asked whether the paid holidays would be forthcoming when the charges were settled, President Baum stated that when respondent made a promise, that promise would be fulfilled when possible. The idea of these two additional paid holidays had not initiated with respondent but with the Committee which had submitted its demand, through Mr. Fonte, in January 1961 and again in May 1961. The Board, however, considers the polling of the employees and this promise respecting paid holidays as efforts to induce the employees to abandon the Union.

In themselves, permission to use company time and premises, and similar acts of cooperation do not constitute such assistance and support as are prohibited by Section 8(a) (2). Hotpoint Co. v. N. L. R. B., 7 Cir., 1961, 289 F.2d 683, 688–689. In that case, Judge Schnackenberg, speaking for the Court, quoted, with approval, Chicago Rawhide Mfg. Co. v. N. L. R. B., 7 Cir., 1955, 221 F.2d 165, 167, to the effect that:

"'Support' is proscribed because, as a practical matter, it cannot be separated from influence. A line must be drawn, however, between support and cooperation. Support, even though innocent, can be identified because it constitutes at least some degree of control or influence. Cooperation only assists the employees or their bargaining representative in carrying out their independent intention. If this line between cooperation and support is not recognized, the employer's fear of accusations of domination may defeat the prinipal purpose of the Act, which is cooperation between management and labor."

Assistance and cooperation do not necessarily spell domination. See N. L. R. B. v. The Post Publishing Co., 7 Cir., 1962, 311 F.2d 565, where Chief Judge Hastings has set out the position of this Court on the whole question of cooperation as distinguished from support.

■■ Our review of the record as a whole shows that the Board's findings of domination, sponsorship and support, within the meaning of Sections 8(a) (2) and (1), and interference with employees' rights, within the meaning of Section 8(a) (1), are unsupported by substantial evidence. The inferences which the Board has drawn from the testimony in this case, as indicated by examples above, are unreasonable. The mere possibility of, or potential means for, interference and support do not form a substantial basis for an unfair labor practice finding in the absence of evidence that such potential has been realized. Chicago Rawhide Mfg. Co. v. N. L. R. B. (supra) 221 F.2d 170.

The Board's petition for enforcement of its Order against respondent is denied.