**CONTINENTAL DISTILLING SALES COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**INTERNATIONAL UNION OF UNITED BREWERY, FLOUR, CEREAL, SOFT DRINK & DISTILLERY WORKERS OF AMERICA, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 14463, 14516.**

United States Court of Appeals
Seventh Circuit.
June 28, 1965.

Harold A. Katz, Irving M. Friedman, Glenn P. Schwartz, Chicago, James C. Paradise, Cincinnati, Ohio, for petitioner Union.

Lee A. Freeman, William L. Sharp, Sanford I. Wolff, Chicago, for Continental Distilling Sales Co., petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin Pollack, Atty., N. L. R. B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Washington, D. C., for respondent.

Before DUFFY, KNOCH and KILEY, Circuit Judges.

DUFFY, Circuit Judge.

Continental Distilling Sales Company (Continental) seeks to review and set aside a decision and order of the National Labor Relations Board (Board),[1] finding that Continental committed unfair labor practices in violation of Section 8(a) (1), (2), (3) and (5) of the National Labor Relations Act as amended.[2]

The International Union of United Brewery etc. Workers (Brewery Workers), the charging party before the Board, petitioned for a review and modification of that part of the Board's order that denied reinstatement to six employees alleged to have been discriminatorily discharged.

Continental is a wholly-owned subsidiary of Publicker Industries, Inc. which has its home office and a bottling plant in Philadelphia. Employees of that plant have been represented by Brewery Workers Union Local 263. Prior to July 1962 and again on July 10, 1962, Brewery Workers Local 263 had engaged in what the trial examiner described as "unauthorized strikes" against Publicker.

For some time prior to 1962, Publicker had sought to decentralize its bottling activities in order to remain competitive and to obtain lower freight charges. Early in 1962, plans were made for the establishment of a bottling plant at Lemont, Illinois.

During August and September of 1962, the Lemont plant was remodeled and equipped to operate as a liquor bottling plant. The first bottling line was established on September 24, 1962. However, the hiring of employees for maintenance purposes commenced about September 10th. While the remodeling of the building was under way, interviewing procedures with applicants for employment were many times hectic, and often the interview with job applicants was very brief.

On September 19, 1962, Robert Wirth was hired as office manager at Lemont. He had had no previous association with Continental. On February 15, 1963, he resigned to accept a position as employment interviewer with the Illinois Department of Labor.

In August 1962, during mediation efforts in Philadelphia, counsel for Publicker informed Morris, President of Brewery Workers Local 263, of the plans to build a factory at Lemont, Illinois. Morris acknowledged awareness of the plans but expressed disinterest.

On September 6, 1962, Feller, President of the International Union of United Brewery Workers asked Neuman, President of the Board of Publicker, if the latter would consider giving some of the key production workers in Philadelphia an opportunity to work in the factory in Lemont. Neuman rejected the suggestion. Feller then said the Brewery Workers would attempt to organize the Lemont plant.

In late August, Frank Reuter, Business Representative of Production and Miscellaneous Workers Union of Chicago and Vicinity (Production Workers),[3] learned that Continental planned to open a bottling plant in Lemont. In early September he undertook to organize the employees. He stationed himself outside of the Continental premises. As applicants for jobs left the Continental office, Reuter asked them if they had been hired. If an affirmative reply was given, he solicited them to sign authorization cards for the Production Workers Union.

About the middle of September, Reuter called the Continental office and demanded recognition for the Production Workers Union. His demand was ig-

1. The Board's order is dated January 7, 1964 and is reported at 145 N.L.R.B. No. 85.

2. Title 29 U.S.C. §§ 158(a) (1), (2), (3) and (5).

3. Production Workers is an established union with approximately 5500 members in the Chicago area covered by 157 separate labor agreements. It is affiliated with a larger union organized in 1908 that represents 10,093 members who are employees of approximately 1200 different employers.

nored. Later, on September 26, Reuter called Continental's counsel and claimed to represent a majority of the employees at the Lemont plant and demanded recognition. On September 28, Reuter brought ninety-four authorization cards to counsel for Continental. Counsel for Continental checked the authorization cards against approximately 130 to 140 personnel files which had been delivered to his office and concluded that Production Workers represented a substantial majority at the Lemont plant. A letter of recognition was prepared and sent to Production Workers Union.

Contract negotiations were conducted by Continental's attorney with President Milbauer and Mr. Reuter of the Production Workers for three days commencing September 29. On October 1, four copies of the completed agreement were signed by the Union. These were executed by Continental on October 2, and an executed copy was handed to Reuter on October 3. The agreement was effective as of October 1, 1962, and contained among other provisions, wage rates, premium pay, vacation and holiday pay, conditions of work, a health and welfare plan, seniority from the date of hiring, and standard union security and collection of union dues provisions.

The first authorization card for representation by the Brewery Workers was signed on September 28. The representative of that Union made his first appearance at the Lemont plant gate late in the afternoon of October 3, and made demand for recognition of the Brewery Workers union on October 5 by means of a letter mailed on October 4th.

On October 3, after the contract with Production Workers had been executed, Reuter went to the Lemont plant and asked permission to talk with the employees. On October 4, the employees were assembled and Reuter spoke to them briefly of the contract and explained "its features including the union-security clause." After that meeting, Reuter was permitted to talk to the employees privately in groups of two.

Thereafter, when new employees were hired, Continental's Personnel Department handed them 3-part cards, supplied by Production Workers, which contained a membership application, an authorization for dues checkoff and an application for participation in the union Health and Welfare program.

About October 31, the Personnel Department of Continental informed employees who had not signed Production Workers authorization cards, that the Union security clause in the contract required them to join Production Workers union within 31 days after the date of their employment.

On October 5, 6 and 9, six employees were discharged. The Brewery Workers filed charges with the Board claiming these employees were discharged because of union activities. The general counsel for the Board abandoned the charges involving five of these individuals, and argued only that the discharge of Dorothy Reisser was unlawful. Both the Examiner and the Board concluded that none of the six had been discharged for union or concerted activities. This part of the complaint was dismissed by the Board. The Brewery Workers were permitted to file a brief in this case which we have considered. They urge that the discharge of Dorothy Reisser is a classic example of discriminatory discharge.

■ Dorothy Reisser was employed as a line girl on the day shift from September 27 to October 9, when she was discharged pursuant to Supervisor Dean's instructions. Dean had ordered the floor ladies to rotate the girls on the various jobs on the line so that each girl would become familiar with each operation. A few days before October 9, floorlady Domagalski had reported to Dean that Reisser objected to being moved. On October 9, Dean heard Reisser objecting to being moved from the front of the line where she was inspecting labels to the end of the line to do packing. Dean testified he decided at that time to discharge Reisser and later told Wirth, the office manager, that she was to be discharged due to the commo-

tion she raised about being changed in the line. There is no basis for disapproving the findings of the Examiner and the Board with reference to the discharge of Dorothy Reisser. We agree with the Board that her discharge was not in violation of Section 8(a) (1) and (3) of the Act.

The Board contends that Continental gave unlawful assistance and support to Production Workers and interfered with the rights of its employees to select a collective bargaining agent. The Board argues such conduct exceeded the mere expression of a preference and hence was not privileged under Section 8(c) of the Act. The Board says that Continental unlawfully assisted Production Workers by recognizing it and by executing a union-security agreement with it. The Board further contends that Continental violated Section 8(a) (1) and (3) of the Act by discharging employees for failure to apply for membership in the Production Workers.

During the period from September 10 to September 28, the number of applicants who were interviewed for positions exceeded 110. Forty of these testified that after they were hired by the Continental personnel man, but before the interview was ended, they were informed about a union, or that a union man was standing outside the plant gates. Thirty-eight of these forty could be catalogued as follows: Twenty-four testified they were told the union man was or might be standing outside; that he might want to talk to them; that they would not get in trouble if they talked to him; that if they wished, they could join. Five testified they were told there was a union man outside and to sign the card; nine testified that they were told the company would be unionized and there probably would be a man outside with union cards.

There were a number of instances where the individual did not sign a union authorization card but nevertheless, went to work without any further question.

As of September 28, there were approximately sixty individuals hired who had not signed union authorization cards.

■ We do not agree with the conclusion of the Board that the Production Workers did not represent an "uncoerced majority" of employees on September 28 when it was recognized as collective bargaining agent or on October 2 when the labor agreement was executed.

Practically all of the alleged occurrences relied upon by the Board occurred before October 1 at a time prior to the arrival on the scene of any representative of the Brewery Workers Union. During this period there was only one union organizing the Lemont plant, and only one union of which Continental or the Production Workers was aware. There is no instance in the record that during September 1962, any Continental agent solicited employees to sign cards or required execution of cards before permitting an employee to commence employment.

Also, there is no evidence in the record that during September 1962, the Production Workers were permitted to enter the plant or to conduct meetings there or to solicit employees for membership during working hours.

No claim is made that the Production Workers was dominated by Continental or that financial assistance was given by Continental in any form.

■ The Board seems to place considerable reliance on its findings that Lemont was a soft labor market and that residents of Lemont did not have sufficient job opportunities. The Board emphasized the susceptibility of Continental's employees to slight suggestions in a community where allegedly employment opportunities were not too plentiful. But, such reliance was misplaced as there is no evidence in this record to support such finding. Just the contrary was shown. To illustrate, 50% of the forty general counsel witnesses hereinbefore referred to as informed about a union, did not reside in Lemont; they lived in such places as Joliet, Hinsdale, Lockkport and New Lenox. The truth

is, there were not sufficient potential employees living in Lemont to fill the requirements of Continental.

The Board attempts to bolster its weak position as to illegal assistance to the Production Workers by referring to events which occurred after October 3rd. This is supposed to prove illegal assistance prior to recognition of Production Workers on September 28. We disagree.

■ Continental was, in some respects, cooperative, but assistance and cooperation do not spell coercion or interference. In National Labor Relations Board v. Post Publishing Company, 7 Cir., 311 F.2d 565, this Court, speaking through Chief Judge Hastings, said at page 569: "We conclude that the Board erred in failing to properly distinguish between 'support' and 'cooperation' * * The course of conduct engaged in by respondent in its relationship with [independent union] follows that pattern of friendly and courteous cooperation, or even generous action, of the sort we feel brings about the end result in labor-management relations sought by the underlying philosophy motivating the National Labor Relations Act." See also, Chicago Rawhide Mfg. Co. v. N. L. R. B., 7 Cir., 221 F.2d 165.

■ The most that can be said for the Board's order in the case at bar is that a "mere possibility" of interference has been suggested by the remarks made to allegedly susceptible employees, but there is no evidence in this record which shows that the possibility has been realized. There is no showing of actual dominance. The mere possibility is not sufficient. N. L. R. B. v. Magic Slacks, Inc., 7 Cir., 314 F.2d 844, 848. Also, in N. L. R. B. v. Englander Co., 9 Cir., 260 F.2d 67, under a fact situation similar to the case at bar, the Court refused enforcement of the Board's order.

Another pertinent decision is Local 1325, Retail Clerks International Association v. N. L. R. B., 1 Cir., 325 F.2d 293. The Court there said at page 294— "At least in the absence of excessive assistance to a known party one cannot 'discriminate' against someone not known to exist. What the Board is holding is that subsequent occurrences after an accomplished event may cause one to become a discriminator *ab initio*. The unsettling effect of such a rule is apparent on the facts of this case. * * *"

■ We reject the findings and decision of the Board that Continental was guilty of unfair labor practices due to coercion of employees and unlawful assistance to Production Workers Union. The Brewery Workers was notified well in advance of the plans for a factory at Lemont. No employee was threatened or coerced. No employee was offered any kind of benefits for joining the Production Workers Union. Further, during the organization campaign, Production Workers was not permitted on the Company's premises. Employees were hired irrespective of their having signed or not signed with Production Workers.

Section 8(c) of the Act (29 U.S.C. § 158(c)) provides:

"(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this sub-chapter, if such expression contains no threat of reprisal or force or promise of benefit."

■ Thus, Congress gave recognition to the rights of free speech with reference to labor relations. The courts quite generally have held, under this section, an employer may express a preference for one union over another, providing no restraint, threat, economic coercion or promise of benefit is involved. Kimbrell v. N. L. R. B., 4 Cir., 290 F.2d 799; Gem International, Inc. v. N. L. R. B., 8 Cir., 321 F.2d 626; N. L. R. B. v. Englander Company, 9 Cir., 260 F.2d 67.

The order of the Board is approved and will be enforced insofar as it dismisses the allegations and charges of

the complaint that Continental engaged in unfair labor practices by discharging Dave Braverman, Frank Forillo, Jr., Robert Bambic, Robert Higgenbotham, Veronica Brandt and Dorothy Reisser. In all other respects, the order of the Board will be denied enforcement.

The order of the Board here under consideration will be enforced in part and enforcement will be denied in part.

Enforcement ordered in part and denied in part.