**LAKE CITY FOUNDRY COMPANY, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LAKE CITY FOUNDRY EMPLOYEES UNION, Respondent.**
**Nos. 17354, 17429.**

United States Court of Appeals, Seventh Circuit.
Oct. 12, 1970.

---

4. 2 Davis, Administrative Law Treatise, § 11.05, pp. 57–62.

5. Ibid., p. 36.

6. (1966), 125 U.S.App.D.C. 153, 369 F.2d 198.

7. (1954), 347 U.S. 260, 74 S.Ct. 499, 98 L. Ed. 681.

Edward Kolkey, Lawrence M. Cohen, Fred Sudak, Chicago, Ill., Lederer, Barnhill & Fox, Chicago, Ill., for respondent Lake City Foundry Employees Union; Sudak & Grubman, Chicago, Ill., of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, William H. Carter, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Frank H. Itkin, Atty., N. L. R. B., for N. L. R. B.

Before MAJOR, Senior Circuit Judge, and FAIRCHILD and KERNER, Circuit Judges.

MAJOR, Senior Circuit Judge.

In No. 17354, Lake City Foundry Company, Inc. (the Company) petitions to set aside an order of the National Labor Relations Board (the Board), entered on December 3, 1968, in which the Board found that the Company violated numerous sections of the National Labor Relations Act and entered its order. 173 NLRB No. 159. In response, the Board requests enforcement of its order. The case had its genesis in the efforts of Local 233, International Molders and Allied Workers Union, AFL–CIO (Molders Union), to become the exclusive bargaining representative of the employees. A representation proceeding was initiated by a petition filed by the Molders Union on February 21, 1967. Subsequently, but on this same date, the Molders Union, claiming that it represented a majority of the employees in what was agreed to as an appropriate unit, made demand of the Company for recognition as the bargaining agent, which was refused by the Company, but it agreed to an election.

At the time the Molders Union commenced its organizational effort, certain of the Company's employees started organizing Lake City Foundry Employees Union (Employees Union), which intervened in the representation proceeding. The regional director ordered an election which took place on April 28, 1967, which the Employees Union won by a vote of 33 to 25. The Molders Union objected to the election result and, on September 13, 1967, filed charges against the Employees Union, alleging that it had violated the Act by entering into a bargaining contract with the Company. The Board set aside the election on the ground that the Company had committed certain unfair labor practices.

In No. 17429, the Employees Union requests that the Board's order as it pertains to it be set aside, and the Board requests that it be enforced.

Later in this opinion we shall discuss in some detail the activities of the sponsors of the respective Unions, as well as those of the Company. We think at this point it is sufficient to state that there was a vigorous campaign conducted by each of the Unions in an attempt to win a majority.

The contested issues in abbreviated form, as set forth in the Company's brief, are: (1) whether there is substantial evidence on the record as a whole to support a conclusion that the Company refused to bargain with the Molders Union on February 21, 1967, the date on which it made demand for recognition, in violation of Sec. 8(a) (5) of the Act; (2) whether, notwithstanding the employees' rejection of the Molders Union and selection of the Employees Union in a Board-conducted secret ballot election, the issuance of its order requiring the Company to bargain with the Molders Union is an appropriate remedy for enforcing the policies of the Act; (3) whether there is substantial evidence on the record to support a conclusion that the Company violated Sec. 8 (a) (3) of the Act; (4) whether there is substantial evidence to support a conclusion that the Company violated Sec. 8(a) (2) of the Act, and (5) whether there is substantial evidence to support a conclusion that the Company violated Sec. 8(a) (1) of the Act.

The Employees Union raises the additional issue as to whether there is substantial evidence on the record to support the Board's finding that the Employees Union violated Secs. 8(b) (2) and 8(b) (1) (A) of the Act.

The issue as to whether the Company violated Sec. 8(a) (5) of the Act depends upon whether the Molders Union represented a majority of the appropriate unit at the time it requested recognition. We shall first consider that issue.

EARL, KARL AND CARL LUNDQUIST

It was stipulated that these persons were employees of the Company on

February 21, 1967, and worked in the classifications covered by the bargaining unit. It is not disputed but that they worked the same hours, received the same wages and were subject to the same working conditions as other unit employees; voted, without challenge, pursuant to a Board-approved agreement between the Molders Union and all other parties, in the subsequent Board election, and enjoyed no special status as the result of their being the sons of the stockholders of a closely held corporation.

As to these employees, the examiner in his decision stated:

"According to Arnold Lundquist, they voted, notwithstanding an *agreement between the Union and Respondent-Employer that they were ineligible to vote.* It is true that to include them in the unit, at that time, would not have been inconsistent with Board precedent, notwithstanding the fact that Karl and Earl Lundquist are the sons of Elmer Lundquist, and Carl Lundquist is the son of Arnold Lundquist and the further fact that Elmer and Arnold Lundquist are the principal stockholders of Respondent-Employer. *However, since the election herein, the Board has modified existing policy 'so as to exclude from bargaining units the children of individuals who have substantial stock interests in closely held corporations' and has overruled prior cases to the extent inconsistent therewith.* In these circumstances, and notwithstanding the fact that the *three individuals voted without challenge in the election,* I deem myself bound to apply this modified policy and to hold, consistently therewith, that these three individuals should be excluded from the unit." (Italics supplied.)

The Board on brief states:

"The Board, in excluding these three persons relied upon its decision in Foam Rubber City No. 2 of Florida d/b/a Scandia, 167 NLRB No. 81, 66 LRRM 1096 (September 18, 1967), where it had modified prior holdings 'so as to exclude from bargaining units the children of individuals who have substantial stock interests in closely held corporations.' "

The reasoning of the trial examiner by which these three employees were excluded from the unit, approved by the Board on brief, must be rejected. In the first place, the statement attributed to Arnold Lundquist that "they voted, notwithstanding an agreement between the Union and Respondent-Employer that they were ineligible to vote," appears to be a distortion of the record; in fact, the record demonstrates to the contrary.[1]

That they voted without challenge in a closely supervised election in itself strongly negates the finding that there was an agreement that "they were ineligible to vote." The Board on brief does not even mention, much less explain or retract, this erroneous statement by its trial examiner. Neither does either mention Sec. 2(3) of the Act which defines the term "employee" and designates the persons and classes which are excluded therefrom. The sole exclusion on the basis of family relationship is "any individual employed by his parent or spouse."

In National Labor Relations Board v. Sexton, 203 F.2d 940 (CA-6), the court in deciding the precise issue contrary to the Board's contention stated:

"Section 2(3) of the National Labor Relations Act, as amended, 29 U.S.C.A. Sec. 152(3), sets forth what the term 'employee' shall include, and specifi-

---

1. Arnold Lundquist on this point testified:
 "Q. In fact, did those individuals vote in the National Labor Relations Board election?
 A. Well, it was agreed between all parties concerned that that's the place, the Labor Board between Malkin and the union attorney and my attorney and my- self, and those three boys were eligible to vote.
 Q. Did they, in fact, vote as far as you know?
 A. As far as I know, they voted.
 Q. Did they vote without challenge?
 A. There were no challenges in the election."

cally excludes a spouse or child of an individual employer as such an employee, but provides for no other exclusion on the basis of family relationship. The Act, therefore, having expressly set forth the individuals who are excluded from the term 'employee' on the basis of family relationship, we find no justification for the exercise of discretion on the part of the Board, by virtue of Section 9 of the Act, to exclude from the appropriate bargaining unit and from participation in the election for the selection of a bargaining agent any persons on the basis of family relationship other than those specifically excluded under Section 2 (3)."

The same court in Cherrin Corp. v. National Labor Relations Board, 349 F. 2d 1001 (CA–6), reaffirmed its holding in Sexton, and stated (page 1006):

"When the Union challenged Miss Cherrin's ballot, it was challenged on the ground that she was a daughter of the owner. This would have been sufficient to exclude the ballot under the rule followed by the Board before the decision of this court in N.L.R.B. v. Sexton, 203 F.2d 940, but it is not sufficient ground for exclusion since that decision. It was not until the investigation conducted by the Acting Regional Director, after the election for a bargaining agent, that the reasons for sustaining the challenge were based, not upon the fact that Miss Cherrin was a daughter of the owner, but, also, probably as an afterthought, on the ground that, as a result of such relationship, she occupied a special status."

The examiner concedes that it "would not have been inconsistent with Board precedent" to hold that they were eligible to vote. He might further have stated that it would have been in compliance with Sec. 2(3) of the Act and in conformity with the court decisions above noted. However, without mentioning the statutory provision, the Board on brief, in excluding the three persons under discussion, relies on its *Foam Rubber*

decision, *supra*, rendered almost five months after the April 28, 1967 election.

In that case it held that it would "exclude from bargaining units the children of individuals who have substantial stock interests in closely held corporations." In reality, the Board amended Sec. 2(3) so as to exclude not only "a spouse or child of an individual employer as such an employee" as Congress had done, but also "the children of individuals who have substantial stock interests in closely held corporations." The Board cites in support of its *Foam Rubber* decision National Labor Relations Board v. Wyman-Gordon Co., 394 U.S. 759, 89 S. Ct. 1426, 22 L.Ed.2d 709. We think there is nothing in that opinion pertinent to the point. True, the court recognized, as we assume all courts do, that "Congress granted the Board a wide discretion to ensure the fair and free choice of bargaining representatives" (page 767, 89 S.Ct. at page 1430). The court did not authorize the Board to make rules in conflict with a statutory provision; in fact, it noted (page 764, 89 S.Ct. at page 1429):

"There is no warrant in law for the Board to replace the statutory scheme with a rule-making procedure of its own invention. Apart from the fact that the device fashioned by the Board does not comply with statutory command, it obviously falls short of the substance of the requirements of the Administrative Procedure Act."

Assuming arguendo that the Board had the authority, contrary to what we think, to proclaim the rule relied upon, it was a gross abuse of discretion to give it retroactive application.

In Laidlaw Corporation v. National Labor Relations Board, 414 F.2d 99 (CA–7), this court held that the Board properly gave retroactive effect to its decision under the facts of that case. In response to the authorities cited by the company, we stated (page 107):

"These cases stand for the proposition that in certain situations the Board's adoption of a new rule or policy may not be applied retroactively where its

practical effect is to create a hardship on the employer disproportionate to the public ends to be accomplished."

To give retroactive effect to the Board's *Foam Rubber* decision would create a hardship not only upon the Company which was confronted with the problem of determining whether the Molders Union represented a majority in the unit so as to require recognition but also upon the Employees Union which was competing for recognition in a contest that was extremely close, as evidenced by the results of the election. We hold that the three employees under discussion should have been included in the unit.

### LEROY KENT AND LEO FOSTER

The treatment accorded by the Board as to the status of Kent and Foster is an indication of the length it was required to go in order to maintain that the Molders Union represented a majority of the employees at the time demand was made for recognition. Kent was found to have been an employee at the time of such demand and, therefore, entitled to be included in the unit, while the Company contends that he had been discharged. On the other hand, Foster was found not to be an employee and excluded from the unit on the ground that he had been discharged, while the Company contends that he was on the payroll and was merely on a leave of absence.

The examiner found that the bargaining demand was made at "about" 2 p. m. on February 21. Kent testified that he was discharged at 2:45 p. m., and at that time was given his check.[2] When minutes are involved, we do not think it can be held that the general counsel carried his burden of showing that Kent was an employee without more definite proof as to the time the demand was made. It is not sufficient to say, as the examiner found, that it was "about" 2 p. m. The examiner found:

"Kent was employed on February 6, and his last day of employment was February 21. At about 2 p. m. on the latter date, the Union made its oral demand upon Respondent-Employer for recognition. There is testimony by Supervisors Long, Paldorf and Elmer Lundquist that the decision to discharge Kent was made during the morning of that day and that, before the demand for recognition was made on that day, the decision had been implemented by informing Kent of his discharge and by preparing a special paycheck in full payment of wages due as of his normal quitting time of 3 p. m. on that day; and that at the time Kent was discharged it was not known that he was going to work as late as he did that day, namely beyond 2 p. m.; but, that the check covered that full day in keeping with Respondent's practice of giving at least 2 or 3 hours' notice and paying the employee for the full day or full week, as the case may be."

Carl Paldorf, a Company foreman, testified that on the morning of February 21, it was agreed that Kent should be discharged, that his pay check was prepared in the office, and at about 1:30 p. m. he found Kent in the washroom, notified him that he was discharged and gave him his check.

In his decision, the examiner seeks to justify his finding with the statement:

"For as the General Counsel points out, even assuming that Kent was informed of his discharge at 1:30 p. m. that day and given his check, the fact remains that he was still an employee at about 2 p. m. when the Union requested recognition, it being undisputed that he was working until at least 2:30 p. m."

In our judgment, when Kent was discharged and given his check his employment was terminated, even though he may or may not have of his volition

---

2. The examiner in a footnote states that in a prehearing affidavit to the general counsel, Kent fixed the time at 2:30 p. m.

worked a few minutes thereafter. After he was discharged he could not have had any reasonable expectation of future employment. In Whiting Corp. v. National Labor Relations Board, 200 F.2d 43, 45 (CA-7), this court cited many cases, including those of the Board, for the statement:

"* * * that whether one is an employee is a question to be determined by his reasonable expectation of employment within a reasonable time in the future. We find no escape from the clearly established fact that Norgard had no such expectation."

█ In our judgment, the Board's finding that Kent was an employee at the time the demand was made for recognition is without substantial support and he was improperly included in the unit.

█ We also conclude that the exclusion of Leo Foster from the unit was erroneous both as a matter of fact and of law. The Board on brief states:

"The Board's exclusion of Leo Foster from the unit was also proper because he was not an employee when the Union requested recognition on February 21. Foster commenced working for the employer on February 6 and worked only five days. His final timecard for the week ending February 14 bears the notation 'let go—did not show up for work'. While Elmer Lundquist testified that this notation was made during the week ending February 21, he admitted that he deducted the full amount of a loan from Foster's pay on February 14, because Foster *'might not come back'*. In these circumstances, the Board and the Examiner reasonably concluded that the Company had terminated Foster's employment status before February 21. Cf., Whiting Corp. v. N.L.R.B., 200 F.2d 43, 45." (Italics supplied.)

We have cited *Whiting* in support of our conclusion that Kent was not an employee at the time demand was made for recognition, but it furnishes no support for the Board's finding that Foster was properly excluded. Elmer Lundquist, the only witness on this point, testified in relevant part:

"Q. Now, the next employee I would like to ask you about is Mr. Leo Foster. Can you tell me how much he owed you on that week—the week ending February 14?

A. On the week ending the 14th, he owed me $25.

Q. How much was taken out?

A. The whole $25.

Q. Can you tell us why the full amount was taken out?

A. Yes. Leo Foster was with us about a week and a half or so, and the second day he was working, he asked for an advance, and I did give it to him, and this previous Friday, this being the week ending the 14th, the Friday previous to this * * *. Now, on Monday, he didn't come in, and he called me up and said his wife was in an accident or had fallen and was in the County Hospital, and he was taking care of her. And he said he didn't know when he would be in, but he *would be in as soon as he could.* I told him that when he comes in, I would like some kind of proof to show his wife was in the County Hospital, so I would know he wouldn't be telling me a fib on this in not reporting it. And he never did come in after that. Now, when I got to the 14th or 15th, rather, I knew he hadn't been in, and I went out and looked out, and we had new cards in the rack. I went out to see if he was working on Wednesday, and he wasn't either, so I decided I had better take it all. *He might not come back.* [Italics supplied.] Therefore, I took his whole $25 right there. And I didn't see him again.

\* \* \* \* \* \*

Q. I'm going to show you what has been marked as Respondent's Exhibit 23 and ask if these are the two time cards you just mentioned.

A. Yes, they are.

Q. Now, there is a notation on this one, being the one on the left, 'Let go. Did not show for work.' You remember when that was placed on it?

A. That was placed on there during the week of the week ending the 21st. I marked this down on here. When we found that he hadn't returned, there was a notation so he wouldn't forget. I went and picked that card out and marked that 'Let go. Did not return' because he didn't return.

Q. Does the company have a policy with respect to employees who are absent from work by reason of illness or death in their family?

A. Yes, we do.

Q. What is that policy?

A. If the man is absent because of sickness or death or some—almost any excuse—if he does return to work within a reasonable time, he's put back on to work."

The trial examiner reasons that the deduction from Foster's pay check of a personal loan made to him by Lundquist "strongly suggests that it was placed there in advance of February 21, the critical date." From this *non sequitur* the examiner infers that the Company "had decided in advance of February 21, to replace Foster and that he was not in its employ" on that date. This result is reached notwithstanding Lundquist's testimony that the deduction was made because Foster "might not come back," by ignoring the undisputed policy of the Company by which Foster was entitled to return to his job within a reasonable time, and without notice to Foster or acquiescence on his part.

In Sportwear Industries, Inc., 147 NLRB 758, 761, the Board in considering a similar issue stated:

"O'Neal had worked Friday morning, March 22, and then claiming to be ill, took the afternoon off. He did not report on Monday or Tuesday, March 25 or 26, nor did he call to explain his absence. When he failed to report again on Wednesday, March 27, the Respondent hired a new employee in his place. O'Neal never returned and indeed forfeited a half day's pay for Friday morning. Thus, on Monday, March 25, the Respondent knew only that O'Neal was absent because of illness. It did not know O'Neal's plans as to returning to work, nor had it yet decided to replace him. On these facts, we find, contrary to the General Counsel's contention, that on March 25, O'Neal was employed in the unit which District 65 claimed to represent."

See also Trailmobile Division, Pullman, Inc. v. National Labor Relations Board, 379 F.2d 419, 422 (CA–5).

The examiner found that at the time of the Union's demand for recognition on February 21, the unit consisted of 55 employees, which included Kent who we hold should have been excluded. It excluded Foster, Karl Lundquist, Earl Lundquist and Carl Lundquist, who we hold should have been included. Thus, the correct number of employees in the unit was 58 (the exact number of votes cast in the election two months later). The Board on brief states that at the time the Molders Union requested recognition, "30 employees, a clear majority in the 55-man unit, had signed authorization cards." This included Kent who should have been excluded. Thus, under our analysis, out of a unit consisting of 58 employees, only 29, not a majority, had signed authorization cards.

Furthermore, at least ten of those who signed authorization cards testified that they were induced to do so because of misrepresentations made by organizers for the Molders Union, mainly Edwards and Oliver. Such misrepresentations generally consisted of (1) that the Union already had a majority; (2) that if the card was not signed the employee would be required to pay $30 or $35 to become a member of the Union but, if he signed, he would be required to pay nothing; (3) that if he did not sign a card, he would lose his job, and (4) in one instance, that the card was only for the purpose of obtaining an election.

The testimony convincingly demonstrates that the organizers for the Molders Union carried out a well laid plan of misrepresentations in order to induce employees to sign authorization cards. In spite of this showing, the examiner considered the testimony of each witness in isolation when it should have been evaluated in light of the overall situation created by the solicitors for card signatures.

Even with such individual approach, the examiner found that the signatures of Charlie Grandberry and Benny Palmer had been obtained by misrepresentation and that the authorization cards signed by them should not be counted. Grandberry testified that he signed a card only after he and *other employees* in a group were told by, or in the presence of, Edwards, "If you don't sign it you're going to have to pay $50," and that if he did not pay this sum he "would be looking for a job." Even though this testimony was denied by Edwards, the examiner found:

"I am not persuaded that the record preponderates in favor of a finding that Charlie Grandberry understood the purpose of the card when he signed it, without reading it, or that he signed it free of any misapprehension. I, therefore, conclude, and find that Charlie Grandberry's card is not a valid bargaining authorization to the Union and that the card should not be counted."

Benny Palmer testified that he was solicited by Edwards and his testimony was similar to that of Charlie Grandberry as to the misrepresentations made as an inducement for him to sign. Again the examiner found:

" * * * as his * * * testimony raises doubts as to whether he signed the card free of any misapprehension as to whether his job was in jeopardy should he fail to sign the card, I infer, and find, that Palmer's card does not constitute a valid bargaining authorization."

Eight other witnesses testified that they were induced to sign cards because of a misrepresentation of one sort or another. The examiner refused to credit their testimony and thereby refused to invalidate the cards signed by them. We need not rule on the validity of the examiner's finding as to these employees inasmuch as we have already shown that the Molders Union lacked a majority at the time of its demand for recognition. Even so, we think it of some pertinency to relate briefly the testimony of these eight witnesses as it further supports our conclusion that Edwards and Oliver were the architects of a plan to induce employees to sign authorization cards by false and deceptive representations.

Becky Grandberry testified that she was twice solicited by Edwards. On the first occasion she refused to sign, but on the second she signed after being informed by Edwards that "I might as well sign because * * * a majority of the people had already signed anyway" and that if "I didn't join I would have to pay 30 or 35 dollars * * * I wouldn't have to pay if I signed the card." She signed the card without reading it.

Herman Hoskins testified that he first refused to sign a card offered by Edwards. When the second offer was made, in the presence of Oliver and *other employees*, he signed only after being advised by Oliver that "If we didn't sign, that it would cost us $30 or either we would lose our job."

Henry Richard Brown, Sherman Collins and Andrew Rogers all testified that they signed after Edwards told them that those who signed would have to pay nothing, while those who didn't would be required to pay $30. Frank Collins testified that prior to signing he was told, "A majority signed the cards so I might as well sign it, too." Melvin Hughes, a witness for the general counsel, testified without dispute that he signed a card presented by Edwards after the latter had informed him that there had to be an election before the Molders Union could get in.

■ As the examiner found as to Charlie Grandberry and Benny Palmer, cards obtained by misrepresentation should not be counted, and it should be noted that the misrepresentation made to Grandberry was in the presence of "other employees," the names of whom are not shown.

In National Labor Relations Board v. Dan Howard Mfg. Co., 390 F.2d 304 (CA-7), a recent opinion of this court, we held that a card was invalid if obtained on the misrepresentation that a majority of the employees had signed, and stated (page 308):

> "The Examiner acknowledged that if the holding in N.L.R.B. v. H. Rohtstein & Co., 1 Cir., 266 F.2d 407, controlled, the card was invalid. The holding in *Rohtstein* is that where an employee signs an authorization card in reliance upon a union agent's misrepresentation that a majority of employees had signed cards, the card is invalid, at least when the employee cannot readily check the truth of the statement.

> "* * * We follow the *Rohtstein* holding as being the wholesome rule tending toward a more forthright solicitation of authorization cards."

See also National Labor Relations Board v. Montgomery Ward & Co., 399 F.2d 409, 413 (CA-7), and G & A Truck Line, Inc. v. National Labor Relations Board, 407 F.2d 120, 122 (CA-6).

The court in National Labor Relations Board v. Gorbea, Perez & Morell, S. en C., 328 F.2d 679, 682 (CA-1), held:

> "We are compelled to conclude that the waiver of initiation fees predicated upon joining before the election is a substantial organizational inducement."

See also our decision in Macomb Pottery Company v. National Labor Relations Board, 376 F.2d 450, 455 (CA-7).

■ We hold that there is no substantial proof that the Molders Union represented a majority of the employees in the agreed unit at the time it demanded recognition, and that the Company did not violate Sec. 8(a) (5) of the Act in its refusal to recognize it.

## THE ELECTION

As heretofore noted, the Molders Union on February 21, 1967 filed with the Board a petition for election by secret ballot. This petition, as the Board states, was filed prior to but on the same date as the demand for recognition. The Molders Union and the Company entered into a stipulated agreement for a consent election. Upon intervention by the Employees Union, the Molders Union withdrew its approval of the stipulated agreement. It appears that the Molders Union was desirous of an election when it thought that no other name would be on the ballot but, when it became aware that it would be required to contest with the Employees Union in the secrecy of the voting booth, it withdrew its consent. Thus, in the election held under the auspices of the Board and supervised by it, each employee was presented with a ballot which afforded the opportunity to choose in secrecy either the Molders Union or the Employees Union as bargaining agent.

On June 30, 1967, the regional director filed his decision relative to the election, in which he found that the number of *valid* votes counted was 58, of which 25 were cast for the Molders Union and 33 for the Employees Union. He also found that there were no challenged ballots. It is of some significance that the number of *valid* votes counted was the same as we have previously determined to have been the number of employees in the unit at the time the Molders Union made demand for recognition. It is of further significance that Earl, Carl and Karl Lundquist voted in this election without challenge even though, as previously shown, it is the Board's contention that they were not entitled to do so. Moreover, when the Molders Union at a later date filed its objections to the election based on a number of alleged unfair practices by the Company, with the request that it be set aside, it did not allege

that any employee had improperly participated in the election.

Following the objections filed by the Molders Union, a hearing was had in which it was decided that the election was unfair because of certain activities on the part of the Company during the campaign between the two Unions. There was no finding that the Company dominated or controlled the Employees Union but only that it aided and assisted that Union in its effort to organize.

## THE PRE-ELECTION UNFAIR LABOR PRACTICES FOUND BY THE BOARD

In discussing this facet of the case, it is appropriate to keep in mind that the Company was small, operated on a rather informal basis and had no background of anti-union bias. See Wayside Press, Inc. et al. v. National Labor Relations Board, 206 F.2d 862, 866 (CA-9). Its relations with its employees were friendly, and they were allowed more than the ordinary latitude in and about the performance of their work. On brief, the Company makes a statement which is not disputed and appears to be accurate:

> "The record here amply demonstrates the leniency extended by the Company to its small work force: employees were permitted to post notices and use bulletin boards without prior Company approval, to meet for non-work related purposes on Company time and premises, to have leniency as to their break and starting times, to avail themselves of personal loans and to frequently circulate in the plant, and even depart from the plant, for personal reasons. None of these practices were unique to the union situation involved in this case."

We divide the unfair labor practices found by the Board into two categories, (1) those which took place prior to the election, and (2) those which occurred subsequently, as it is not discernible how the latter which relate to the Company and the Employees Union could have had any adverse effect upon the freedom of the employees who participated in the election. Rather than attempt to follow the lengthy report of the trial examiner, we rely upon the findings as stated in the Board's brief which are as favorable to the Board as the record will justify, and in some respects more so, and which ignore many of the decisions of this court.

In the first category of unfair practices the Board found that the Company violated Sec. 8(a) (1) of the Act by coercively interrogating employees concerning their interest in and support of the Molders Union; threatening employees with reprisals for supporting the Molders Union; promising benefits to employees if they would withdraw their support from the Molders Union, and rendering unlawful assistance to the Employees Union in its initial or formative stages.

In the second category of unfair practices the Board found that the Company violated Sec. 8(a) (3) and (1) by entering into a collective bargaining agreement containing in effect a union security clause and by discriminatorily changing its loan repayment practices as to employees Melvin Hughes and James Sims because they supported the Molders Union. Further, the Board found that the Employees Union violated Sec. 8(b) (1) (A) and 8(b) (2) by entering into and maintaining a bargaining agreement with the Company.

The Board's further contention that the Company violated Sec. 8(a) (5) and (1) of the Act by refusing to recognize and bargain collectively with the Molders Union has previously been considered and rejected.

Prior to a consideration of the facts, it is well to keep in mind two provisions of the Act particularly material. Sec. 8(a) provides:

> "It shall be an unfair labor practice for an employer—
>
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title * * *."

Section 8(c) provides:

"The expressing of any views, arguments, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this sub-chapter, if such expression contains no threat of reprisal or force or promise of benefit."

We also note some important principles enunciated by this and other courts. Continental Distilling Sales Co. v. National Labor Relations Board, 348 F.2d 246 (CA–7), is based on a factual situation quite similar to that here. Citing opinions of this court, Judge Duffy in a well reasoned opinion stated (page 251):

"Continental was, in some respects, cooperative, but assistance and cooperation do not spell coercion or interference. In National Labor Relations Board v. Post Publishing Company, 7 Cir., 311 F.2d 565, this Court, speaking through Chief Judge Hastings, said at page 569: 'We conclude that the Board erred in failing to properly distinguish between "support" and "cooperation" * * *. The course of conduct engaged in by respondent in its relationship with [independent union] follows that pattern of friendly and courteous cooperation, or even generous action, of the sort we feel brings about the end result in labor-management relations sought by the underlying philosophy motivating the National Labor Relations Act.' See also, Chicago Rawhide Mfg. Co. v. N. L. R. B., 7 Cir., 221 F.2d 165.

"The most that can be said for the Board's order in the case at bar is that a 'mere possibility' of interference has been suggested by the remarks made to allegedly susceptible employees, but there is no evidence in this record which shows that the possibility has been realized. There is no showing of actual dominance. The mere possibility is not sufficient. N.L.R.B. v. Magic Slacks, Inc., 7 Cir., 314 F.2d 844, 848."

On the same page, referring to Sec. 8(c), he stated:

"Thus, Congress gave recognition to the rights of free speech with reference to labor relations. The courts quite generally have held, under this section, an employer may express a preference for one union over another, providing no restraint, threat, economic coercion or promise of benefit is involved. [Citing cases.]"

We also call attention to the wholesome rule announced in National Labor Relations Board v. Zelrich Company, 344 F.2d 1011, 1015 (CA–5):

"For conduct to warrant setting aside an election, not only must that conduct be coercive, but it must be so related to the election as to have had a probable effect upon the employees' actions at the polls. The presumption is that ballots cast under the safeguards provided by Board procedure reflect the true desires of the participating employees."

Further, the statement by the Supreme Court in the recent case of National Labor Relations Board v. Gissel Packing Co., Inc. et al., 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547, is highly pertinent:

"Thus, an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.' He may even make a prediction as to the precise effects he believes unionization will have on his company."

After relating the facts relative to the activities of those who were interested in the Molders Union, together with the program which they adopted for the solicitation of cards from employees desiring that Union as its bargaining agent, the Board states the alleged unfair practices committed by the Company.

Edwards, one of the main participants in this campaign, commenced the solicitation of memberships. President Arnold

Lundquist invited Edwards to his office and Edwards remarked that he presumed Lundquist wanted "to talk to him about the Union," and Lundquist answered, "I sure do * * * I heard you all was trying to get a union in the shop." Edwards acknowledged his Union activity and Lundquist then questioned him about his "gripes." Edwards stated that he had "been working for Lake City for 17 years and that he felt that if he wanted to advance to another job should have the right to do so." Lundquist explained to Edwards that he had been unaware of the employees' complaints because "I am in and out of the shop every day and don't know what's going on in there."

Edwards evidently discerned no animus or hostility on the part of Lundquist as he stated that Lundquist was a "square shooter" and had loaned him money to enable him to attend his father's funeral. Lundquist among other things stated, "Why don't you guys organize your own union, we don't want an outsider to come in and tell us what to do." Lundquist told Edwards, "The guys will follow guys like yourself, Jim Burns and Hardy Lowe," and concluded the meeting by stating, "If you want a union that's your own business but I wish you would hold off until superintendent Long returns from his vacation" because "Woody could get things straightened out."

■ The following day Lundquist showed Edwards a letter which he had received from the Molders Union stating that it was conducting an organizing campaign and naming Edwards and several other workers as organizers. Lundquist stated, "I see it's official." The Board overlooks the fact that most of the statements made by Lundquist in his conversation with Edwards were of a friendly nature and in response to questions by Edwards. In our view, there is not the slightest basis for the finding of an unfair labor practice based on this conversation. It does show that Lundquist was opposed to an outside Union and so expressed himself, as he had a right to do, but that if there was to be a Union he preferred one by the employees and so expressed himself, this also as he had a right to do as long as there were no threats of reprisal or force or promise of benefits, which there were not.

Later during the same week, Company secretary Elmer Lundquist had a talk with employee Melvin Hughes and asked him why he was wearing the button and if he was going to join the Molders Union. Lundquist told him that the Company did not want the Union, that it was no good and that he would no longer get personal loans from the Company if the Union got in. He also stated that with the Union "you lose all of your overtime and there will be a lot of lay-offs because the Union will want you to go on strikes." Elmer Lundquist discussed the situation in the same vein with other employees, with the statement, "If the union got in here, we might have strikes and loss of time because of strikes."

■ Elmer Lundquist also asked employee Rose Lillybridge, whether she knew "those union guys had been around here." He told her that he and his brother, Arnold, had "worked hard to build this business" and he was "not going to let those guys sitting downtown drinking martinis tell him how to run the business." He also told her, "if the Union got in here, we might have strikes and loss of time because of strikes," and specifically "mentioned U. S. Steel and how they have strikes every little while and layoffs and loss of time," and she "ought to consider that." These statements by Elmer Lundquist were no more than an expression of opinion and were permissible under Sec. 8(c).

■ The Board relies upon Company changes in its loan repayment practices as to employees Melvin Hughes and James Sims as constituting a withdrawal by the Company of economic benefits. Such loans were made in small amounts to employees, ordinarily repayable in weekly installments. They were made and their payment supervised by Elmer Lundquist. For the period ending February 14, 1967, Hughes and Sims owed balances of $30 and $35, respectively, on

cash loans. The two employees were to receive their pay checks on Friday, February 17, minus the usual weekly deductions on the unpaid balances of their loans. They learned for the first time on February 17 that Lundquist had deducted from their pay checks the total unpaid balance. Lundquist testified that the deductions were made for the reason that neither employee "was deserving of that advance," and that he had so stated to Hughes and Sims. The Board states that the reason for the deductions was that Hughes had been wearing a union button and that both served as organizers for the Union. The fallacy of this reasoning is that Lundquist saw Hughes wearing a union button only after the deduction had been made, and the only knowledge the Company had as to Sims was that he had been listed as an organizer, along with others, in the Union's letter of February 11. There were other employees named in the same letter who did not have the full amount owed deducted. In any event, this facet of the Board's case borders on the frivolous.

This court in an opinion by Judge Hastings, National Labor Relations Board v. Peerless Products, Inc., 264 F.2d 769, 772 (CA–7), stated:

"Upon consideration of the record as a whole we have concluded that the interrogation of the employees was not intended to and did not interfere with their organizational activities, that there were no coercive threats made to them, and that the calling in of the small personal loans for repayment did not constitute a withdrawal of economic benefits by the Company in violation of Section 8(a) (1) of the Act. At best these charges were petty and trivial."

In National Labor Relations Board v. Cosco Products Co., 280 F.2d 905, 909 (CA–5), the court stated:

"* * * that it is even more difficult to understand how the board could make and support 'the petty and trivial charge' that in respect of its handling of personal loans to its employees, which it was not obligated to make and made only as an accommodation, the respondent had committed an unfair labor practice."

The Board asserts that management unlawfully assisted its employees in the formation of a Union of their own. We have heretofore related the conversations between Arnold Lundquist and Edwards which took place on February 14, and need not repeat. Subsequent to the Lundquist-Edwards conversations, according to the Board's brief, Burns, Lowe and a number of other employees who were opposed to the Molders Union visited Lundquist in his office. Burns stated to Lundquist in the presence of the others, "Some of the men want us to sign up for the Molders Union. Don't we have any rights of our own?" Lundquist replied, "Jim, I don't even know my own rights. Let's see an attorney and clarify your position." On the following day, Burns told Lundquist that he had talked to a number of employees and had received a favorable reaction from the "old timers" to the idea of forming "our own union." Lundquist replied, "Okay, it's up to you," and told the employees, "Leave me out of it."

On February 18, Burns left work without punching out his time card and, accompanied by co-worker Randolph, visited attorney Fred Sudak to discuss "organizing a union at the plant." After thus conferring with the attorney, Burns, Randolph and others met with Lundquist at the plant and told them of their visit to see a "lawyer about organizing a union, our own union" and requested "permission to hold a meeting and get the employees together." Lundquist commented that having "your own union" was "a good idea," and gave written permission to hold a meeting in the plant the following Monday, February 20, during a slow work period.[3]

3. This latter statement was based on the testimony of Randolph, and was directly denied by Burns, two other employees and Lundquist.

Because Burns followed Lundquist's suggestion and obtained a lawyer to advise him of his rights, the Board appears to discern some sinister purpose, without justification. On this point we agree with the court's statement in The Schwarzenbach-Huber Company v. National Labor Relations Board, 408 F.2d 236, 247 (CA–2):

> "We wish to make it plain that employers as well as unions have a perfect right to consult their lawyers. That is what lawyers are for. If consultation with counsel indicates anything, it shows a desire to conform with legal requirements, to obey the law. It is quite reprehensible and wrong to insinuate, or to imply or to state that an adverse or damaging inference or deduction is to be made from the fact that an employer consults his lawyer in connection with any matter involving the relationship between an employer and his employees or a Union or in connection with any labor dispute or controversy."

On February 20, Burns prepared a cardboard sign which he posted in a conspicuous place in the plant, stating that a workers' meeting would be held at the finish of pouring that day, with no pay loss for attendance. Arnold Lundquist informed the employees of the meeting and gave instructions that no supervisors would attend. Elmer Lundquist was told of the meeting and notified the employees in his department that they "could quit their work, shut down their machines and go to the meeting." Lundquist told workers who did not want to attend, "You can go home."

We need not set forth all of the statements contained in the Board's brief, as they have to do with innocuous conversations. Two of such statements are typical. Supervisor Long made a statement to employee Garrett, which the Board describes, "Staring[4] at the Molders Union button which Garrett was wearing, Long said, 'You are looking good. You'd better keep that up later on.' "

Elmer Lundquist in a conversation with Bates "warned that he should 'consider his family' because if the union got in, there might be less work and Bates, 'being a new employee,' was 'the lowest man on the totem pole and would be the first one to get laid off.' " This statement was no more than an expression of opinion and evidently referred to the Union's seniority system by which the employee with the least seniority would be the first to be laid off.

The Board concedes that all employees were given the option of attending the meeting. Those who did not desire to attend were paid for the full day, the same as those who did. The meeting was held in the shipping area and employee Randolph explained that its purpose was to form "our own company union." Burns explained that he knew an attorney who could help them do so. The Board overlooks the fact that those favorable to both Unions attended this meeting and a heated discussion took place as to the merits of the two Unions. Included in those who attended and participated in the discussion was Edwards, an organizer for the Molders Union and a principal witness for the Board.

Burns again requested and was permitted by Arnold Lundquist to hold another employee meeting at the plant, which was held on February 22, so that the attorney could speak to the employees "about their rights." Burns testified that at this meeting the attorney among other things stated, "* * * said he was from the Bar Association and that he was there to help us form this union; * * * he said company unions sounds too stiff, and it sounded kind of bad * * so he said we would make it the Lake City Foundry Employees Union; and he also said * * * we could get char-

---

4. There is no proof, and the examiner who heard the witnesses did not find, that Long was "staring." We assume it is used by the Board to indicate that a harmless statement, and one without meaning, was made with animus. Another favorite characterization by the Board, used many times, is "warned," which appears to be used for the same purpose.

tered by the state and we wouldn't have to fool around with Washington, D.C." (The attorney was employed by Burns and paid by the Employees Union.) At the meeting a petition authorizing the Employees Union to represent the employees was circulated and signed by 31 employees. On the next day, Burns polled the employees in the plant and gave each a slip of paper marked "yes" or "no" for the Employees Union, but the result was not announced. The Board on brief states, "The polling lasted over one hour and was conducted in the presence of supervisors."[5] Furthermore, the activities of Burns as well as other employees should be evaluated in the existing environment. As previously noted, the Company operated on an informal basis. Burns in particular was a free lance. He circulated among the employees during the work time and frequently left the plant for a wide variety of personal reasons, without discipline, regulation or loss of pay. His activities were often without the knowledge or prior permission of any supervisor.

■ The Board's theory that the Company unlawfully assisted the Employees Union by permitting it to hold meetings on Company property is without merit. As shown, the first meeting was for all employees who desired to attend. Meetings on the Company's premises were not unique; in fact, it was common practice. Also, it must be noted that such meetings were not discriminatory as to the Molders Union because it made no request to meet on Company property.

In Chicago Rawhide Mfg. Co. v. National Labor Relations Board, 221 F.2d 165 (CA–7), this court refused to enforce a Board's order. Among the charges made against the company was that it permitted the union to transact its business and to post bulletin boards on company premises. We stated (page 170):

"The acts complained of show only laudable cooperation with the employees' organization, which represented a majority of the employees, rather than interference or support. Allowing the use of Company property, and even time, for employee meetings is not in itself an unfair labor practice. Wayside Press, Inc. v. N. L. R. B., 9 Cir., 206 F.2d 862."

In National Labor Relations Board v. Post Publishing Company, 311 F.2d 565 (CA–7), we again denied enforcement of the Board's order, upon facts more favorable to it than those here. We expressly approved our previous decision in *Rawhide* and held that permitting the Union to hold meetings in its cafeteria, to print notices on the employer's duplicating machine and to retain profits of about $600 from the operation by the Union of employer's cafeteria for employees, all at the instance and request of the Union, were (311 F.2d page 569):

"* * * a permissible form of friendly cooperation designed to foster and resulting in uninterrupted harmonious labor-management relations, and is not the form of 'support' designed to interfere with, restrain or coerce employees in the free exercise of their right to choose or change their bargaining representative."

In National Labor Relations Board v. Magic Slacks, Inc., 314 F.2d 844, (CA–7) we approved *Rawhide* and *Post* with the statement (314 F.2d page 847):

"In themselves, permission to use company time and premises, and similar acts of cooperation do not constitute such assistance and support as are prohibited by Section 8(a) (2). [Citing cases.]"

See also Continental Distilling Sales Co. v. National Labor Relations Board, 348

5. This is an inaccurate statement. There is no evidence that the polling took place in the presence of supervisors. The examiner found only that they "were present in the vicinity." In addition, there is much uncontroverted evidence that the poll was taken without the knowledge or consent of the Company or any of its supervisors, and that the result of the balloting was not communicated to management.

F.2d 246 (CA–7), *supra,* from which we have previously quoted.

The Board relates a conversation which purportedly took place before the election, between superintendent Long and Oliver. Oliver testified that Long inquired, "How long was he going to be around, until he gets the union in?" and that Long stated, "Oh, I know you are the organizer." Long positively denied that he ever made such a statement.

██ The Board also refers to the fact that Burns distributed handbills which listed the advantages offered by the Employees Union; that employee Hughes testified that Burns offered him $15 to vote against the Molders Union but that he told Burns that he "wouldn't take the money," that "Burns couldn't buy him like that." Burns categorically denied that any such conversation took place and that he had not even talked to Hughes about the Molders Union. Assuming that such a conversation took place, Burns was not a representative of the Company and it is not perceivable how it would be relevant to any unfair labor practice charged against it.

██ The Board places great reliance upon two letters written and sent by the Company to all of its employees, both before the election, one dated February 28, 1967 and the other April 25, 1967. The examiner found that these letters constituted unlawful interference and assistance rendered to the Employees Union, in violation of Sec. 8(a) (2) and (1) of the Act. In our view, the Board's case as it relates to unfair labor practices by the Company prior to the election must stand or fall on the contents of these letters. They epitomize the nature of the threats and coercion relied upon by the Board, as well as the assistance found to have been rendered by the Company to the Employees Union. They afford no opportunity for selecting a word or a sentence here and there, out of context with the whole, as has so often been done with the oral testimony. We think it essential, therefore, to set forth these letters, both written on Company stationery, in their entirety.

The letter of February 28, 1967 stated:

"This outside union election on March 22 is serious. The outcome may seriously affect you—your job—your future—and the welfare of those who depend upon you.

"There is only one basic issue—WHO CAN RUN YOUR COMPANY BEST —these outsiders or the people you know?

"Please ask yourself these questions. Who created the jobs here? Who constantly improved things around here? Why the sudden interest of these outsiders? Are you willing to put yourself under the power of these unknown outsiders?

"Who can best provide the kind of job you want—these outsiders or the people you know?

"You know our policy of continued improvement. Look at the record. If we are left free to run Lake City Foundry without interference, we will continue these policies.

"Are you willing to risk what you have? Are you willing to gamble with your own future? The risk is this— do you know how much harm these outsiders can do?

*"You're going to hear a lot of union promises from now until March 22. We plan to continue to tell you the FACTS, and only the FACTS! Please make your decision on FACTS and not on promises!"* (Italics supplied.)

The Board on brief sets forth what it designates as the pertinent part of this letter but for some unexplained reason omits the last paragraph, which we have italicized and which is perhaps the most important statement in the letter.

The letter of April 25, 1967 (three days before the election) stated:

"In the election this Friday, you will make an important choice. Basically you will choose between two unions. What are the reasons for voting for one union or the other?

"First, as to the outside union. They are strangers to all of us. They don't know our ways—they don't know our problems. They have heavy expenses, which you will have to help pay out of your dues money. They have a long history of strikes.

"Second, as to your own union. They are new at this union business. But they don't have big expenses for you to pay. They don't have a history of strikes. Most of all, they are *you*—not outsiders! They know *you*—they know us—they know our problems.

"You know what we have done in the past. We have always done at least as well as the outside union contract—usually better.

"For example—the outside union has a pension plan—to which each employee must contribute 10¢ an hour OUT OF HIS OWN POCKET! We have a better pension plan—for which you pay nothing! If this outside union won, it could insist on its own plan—and you would start off 10¢ in the hole!

"You, of course, will make the choice. But we honestly believe both you and ourselves would do better to deal with people we know, not with strangers.

"This is all we have to say. But this election is really a deeply serious matter. Please, *think hard* before you vote!"

In our judgment, these letters when considered in their entirety cannot be fairly interpreted as interference, restraint or coercion of the employees and the statements contained therein come clearly within Sec. 8(c) of the Act which permits "The expressing of any views, argument or opinion, or the dissemination thereof" as they contain "no threat of reprisal or force or promise of benefit."

In The Schwarzenbach-Huber Company v. National Labor Relations Board etc., 408 F.2d 236 (CA–2), the court held that a speech made by the president of the company to the employees and a letter written to them by him shortly before the election did not constitute violations of Sec. 8(a) (1) and Sec. 8(c), as had been found by the Board. The letter in that case is set forth in its entirety at footnote 10, page 253, of the opinion. The court's analysis of the letter in that case furnishes strong support for our evaluation of the letters in this case.

This court has also on numerous occasions denied enforcement of a Board's order which found a violation of Sec. 8 (a) (1), based upon interrogation of employees concerning their union membership. We cite three cases, in all of which the facts were more favorable to the Board than they are here. Sax v. National Labor Relations Board, 171 F.2d 769 (CA–7); National Labor Relations Board v. Arthur Winer, Inc., 194 F.2d 370 (CA–7), and National Labor Relations Board v. Chicago Perforating Company, 346 F.2d 233. In *Sax*, this court in response to the Board's contention, stated (171 F.2d page 773):

"Mere words of interrogation or perfunctory remarks not threatening or intimidating in themselves made by an employer with no anti-union background and not associated as a part of a pattern or course of conduct hostile to unionism or as part of espionage upon employees cannot, standing naked and alone, support a finding of a violation of Section 8(1). In Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430, the Supreme Court said: 'Accordingly, decision here has recognized that employers' attempts to persuade to action with respect to joining or not joining unions are within the First Amendment's guaranty. National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348. Decisions of other courts have done likewise. [Cases cited.] When to this persuasion other things are added which bring about coercion, or give it that character, the limit of the right has been passed. [Cases cited.] Cf. National Labor Relations Board v. Virginia Electric & Power Co., supra.

But short of that limit the employer's freedom cannot be impaired.' "

In Winer, we cited Sax with approval and in further support thereof cited cases of this and other courts. In Chicago Perforating, after reviewing the facts (346 F.2d pages 234 and 235), we stated concerning the Board's finding (page 235):

"The most it shows is that respondent, when suddenly confronted with a demand by the union for recognition, was much concerned. Its interrogations of Hubbard, Bartolomei and Williams were entirely innocuous. The statements made to Robinson, Sadowski, and a month later to Williams, were nothing more than an expression of opinion (see 8(c) of the Act), and form no basis for a finding of interference, restraint or coercion in violation of 8(a) (1)."

See also this court's opinion in National Can Corp. v. National Labor Relations Board, 374 F.2d 796 (CA–7), where we again refused to enforce a Board's finding that the company violated Sec. 8(a) (1) of the Act.

■■■ These and many other cases stand for the proposition that there is no sanction imposed upon the right of an employer to express his views on labor policies or problems, or to express his preference of one competing union over another, even to take sides provided he does not coerce, restrain or interfere with the selection of a bargaining representative.

■■■ In our judgment, the record when considered as a whole does not furnish substantial support for the Board's findings that the Company committed unfair labor practices prior to the election. Even if we assume, however, that some minor and isolated violations occurred, they were of a nature which could not have had an impact upon the election which would justify its nullification. While we recognize that the Board has a wide discretion in such matters, National Labor Relations Board v. Realist, Inc., 328 F.2d 840 (CA–7), and National Labor Relations Board v. Red Bird Foods, Inc., 399 F.2d 600, 602 (CA–7), we hold in this instance that it acted arbitrarily and without justification.

We have heretofore set forth the circumstances under which the election was held, and need not repeat. It would be difficult to visualize an election held under circumstances so nearly perfect. Every employee was presented with the opportunity in the secrecy of the voting booth of choosing between the two Unions. Every employee voted, every ballot was valid and counted. To hold under the circumstances that they did not freely choose their bargaining agent is a challenge to realism, ignores the traditional means preferred by the Board and the courts as the best way of selecting a bargaining agent, and is a reflection on the intelligence of those who participated in the election.

Our thorough study of every facet of this case leaves us with the deep conviction that the Board's decision is not supported as either a matter of fact or of law. We find ourselves in the position described by the Supreme Court in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456:

"Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

In No. 17429, the Board found that the Employees Union violated Sec. 8(b) (1) (A) by entering into a bargaining agreement with the Company during the pendency of the objections to the election and at a time when it was neither certified nor designated by the Board to be representative of the Company's employees. That contract contained a union security clause requiring all employees to join or pay union dues to the Employees Union.

The Board further found that the Employees Union violated Sec. 8(b) (2) of the Act by its successful efforts to have the Company enforce the security clause of the contract.

 The Board's order against the Employees Union rests squarely on the premise that the election which it won was a nullity. Inasmuch as we have decided that the election was lawful and improperly set aside by the Board, the premise is no longer tenable. Thus, the issue is whether the Company upon demand by the Employees Union was required to recognize it as the bargaining agent. In this connection it is pertinent to note that the Board did not order the Employees Union to be disestablished or disbanded, and it thus remained a viable labor organization. We hold that the Employees Union had a right to be recognized and to enter into a bargaining agreement with the Company.

 The Board also contends that the Employees Union should not be heard in this court because it failed to take any exception to the trial examiner's findings which were adopted by the Board. This contention is based upon a provision in Sec. 10(e) of the Act, which states, "No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." See National Labor Relations Board v. Ochoa Fertilizer Corp. et al., 368 U.S. 318, 320, 82 S.Ct. 344, 7 L.Ed.2d 312. Evidently the purpose of the rule is to afford the Board an opportunity to pass upon an issue as a prerequisite to the right of a court review. The Board was afforded that opportunity in this case because the issue was specifically raised by the Company in its exceptions to the examiner's report and was decided by the Board adversely to the Employees Union. We think the Board's contention in this respect is without merit.

In No. 17354, the petition of the Company to review and set aside the Board's

order is allowed, and the Board's request for enforcement is denied.

In No. 17429, the petition of the Board for enforcement of its order as it pertains to the Employees Union is denied.